UNITED STATES of America, Plaintiff-Appellee,

v.

Guadalupe RODRIGUEZ, Victoriano Lozano Vega, Rolando Garcia and Rene Castillo Tamez, Defendants-Appellants.

No. 73-2008.

United States Court of Appeals, Fifth Circuit.

Aug. 5, 1974.

Anthony J. P. Farris, U. S. Atty., Robert Darden, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Abel Toscano, Harlingen, Tex., for Lozano Vega.

George W. Storter, Brownsville, Tex. (Court-appointed), for Rene Castillo Tamez.

Daniel S. Trachtenberg, Houston, Tex. (Court-appointed), for Rolando Garcia.

L. Aron Pena, Edinburg, Tex., Melchor Chavez, Harlingen, Tex., for Guadalupe Rodriguez.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

At the conclusion of their joint trial by jury all four appellants were found guilty as charged for their respective roles in a conspiracy to sell some 106 pounds of marijuana to a federal undercover agent. Specifically, all were found guilty of distributing and possessing with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and conspiring to distribute the same in violation of 21 U.S.C. § 846. In addition, appellants Rodriguez and Vega were convicted of carrying firearms during the commission of a felony in violation of 18 U.S.C. § 924(c)(2). We affirm the convictions on all counts. We do, however, find error in the sentencing proceedings which requires that we vacate the sentences of Rodriguez and Vega and remand for sentencing.

The testimony of government witnesses, primarily Bonnie Maldonado, a co-conspirator who pleaded guilty, presented the following description of events comprising and surrounding the crime.

While working as a dancer in a club in Harlingen, Texas, Bonnie was approached by a friend whom she knew as Dave, but whom she did not know as the informer he was, concerning the availability of at least fifty pounds of marijuana. Very shortly thereafter, she came in contact with another ·friend named Rayford and appellant Garcia, who indicated their willingness to sell well over fifty pounds. With Bonnie as the go-between, an initial deal was made for Garcia and Rayford to deliver 500 pounds of marijuana at a street corner near Rayford's house at seven o'clock Friday night.

Around six o'clock of the pre-arranged evening, Dave took Bonnie back to his room at the Holiday Inn in Harlingen, where he introduced her to George, an undercover customs agent posing as the prospective buyer. While at the hotel, she called Rayford and confirmed the transaction set for seven o'clock. But, when seven o'clock rolled around, Garcia did not show up at the corner as promised; instead, Bonnie located him at Rayford's house where he informed her that it was too risky to do business in that neighborhood. Garcia then followed Bonnie back to the corner, where he was introduced for the first time to George, his prospective purchaser. An agreement was made for the delivery to be made at George's room at the Holiday Inn. George returned to his room to await delivery; instead he received a call from Garcia, saying that he wanted to see the money first. George agreed, and a short time later Garcia showed up at the door accompanied by defendant Tamez. After Garcia and Tamez saw the money, they promised to deliver the dope to the parking lot about an hour to an hour-and-a-half later. An hour-and-a-half after they left Tamez came back to the room and reported that they had run into some trouble, could only deliver 100 pounds that night, but could deliver the other 400 pounds within three or four days. Bonnie went down to the hotel parking lot where Garcia was waiting in a red pickup truck and persuaded him to come up and confirm Tamez's story. He did, and George assented. But then Garcia informed him that he would not use one of his own vehicles to transport the marijuana, whereupon Dave agreed to loan them his car, a green Ford.

Garcia got into the red pickup and told Bonnie and Tamez to follow him in Dave's car. After leaving the Holiday

Inn, Garcia stopped his pickup, and Bonnie saw defendant Rodriguez get out of a white car and into the pickup with Garcia. When they stopped for gas, Garcia told Bonnie to follow him onto the Valley Highway, which leads from Harlingen to Weslaco and then to Pharr. After she and Tamez had followed Garcia and Rodriguez past Weslaco, Bonnie insisted that Garcia pull over and tell her where they were going. Garcia told her that the marijuana was in Pharr. He then asked Tamex to drive the truck, assuring him that Rodriguez was fully familiar with the plan and could show him where to stop. With Garcia driving Dave's car, he and Bonnie assumed the lead to Pharr where they parked off the highway. When the pickup pulled in behind, Garcia told Bonnie to stay with Tamez in the truck while he and Rodriguez were gone in the car. She and Tamez drove around in the pickup for about twenty minutes and then came back to the spot on the highway to await Garcia's return. Before too long, the car pulled in behind them, Garcia and Rodriguez got out and into the truck with her and Tamez, and the car departed. This was Bonnie's first indication that someone else was involved, although she did not see those who let out Garcia and Rodriguez. While in the pickup with the three men, Bonnie noticed that each of them had a gun. After waiting for some time, they took the pickup to a gas station. When Bonnie came out of the restroom, she saw Dave's car pull in, driven by defendant Vega, who was the sole occupant, and followed by a green pickup. Vega got out of Dave's car and into one of the pickups. Bonnie got into the passenger side of the car and Garcia got into the driver's seat, whereupon he told her that they had "made it" and that the marijuana was loaded. They then headed back to Harlingen at a high rate of speed, followed by the red and the green pickups. When they arrived at the Holiday Inn, Garcia yelled at the passing trucks to park across the street. Garcia parked the car at the hotel and left the keys in it. When Bonnie went up to the room to report that the dope

had arrived, Garcia rejoined his friends in the pickups. Garcia and Tamez in the green pickup and Vega and Rodriguez in the red then circled the block awaiting Bonnie's consummation of the deal.

Meanwhile, Bonnie told George that the loaded car was parked out front. As she and George were going down to inspect the load, she advised him that the occupants of the pickups involved were armed. When George opened the trunk, he feigned dissatisfaction that the marijuana was not in bricks, and told her to drive the car around back where he could check it out further. After Bonnie took the car to the rear lot, she noticed a "commotion" across the street and ran up to Dave's room to warn him that people were getting "busted." She was met by customs officers and arrested.

Apparently, the commotion noticed by Bonnie was the apprehension of the occupants of the pickups. While she was concluding her job as middleman, the pickups were under surveillance by federal agents. A team composed of customs agents Morrison and Ross pulled over the red pickup as it left a brief rendezvous with the green. Both Vega, who was driving, and Rodriguez, who was a passenger in the red truck, were arrested, along with a third occupant against whom, due to insufficient evidence, the court dismissed all charges at trial. One pistol was taken from Vega, and another found on the floorboard was claimed by Rodriguez. At approximately the same time, a second team of customs agents had stopped the green pickup and apprehended its occupants, Tamez and Garcia. All those arrested were then assembled at the motel, from which they were transported to jail.

Substantial evidence supports each element of the above description, and we accept it as true in evaluating each appellant's assertion that there was insufficient evidence to convict him. Each of the four also raises other points on appeal more or less specific to him. Con-

taining only a few complaints in common, the appeals are best treated individually.

## I.

### GARCIA

■ A. Garcia's argument that the evidence against him was insufficient to sustain a conviction is meritless. As set out above, the testimony of both Bonnie Maldonado and the undercover agent who posed as the buyer (George) portrayed Garcia as the most visibly active member of this conspiracy. He negotiated the transaction, conducted the expedition to pick up the marijuana, and delivered it to the motel. Such activity constitutes distributing, possession with intent to distribute, and participation in a conspiracy to distribute marijuana— the three counts on which he was charged and convicted. In his defense Garcia offered no plausible explanation of the testimony of the government witnesses. Instead he chose to deny that he even knew Bonnie Maldonado, had ever met with the undercover agent, or had any knowledge whatever of the transaction. He maintained that when arrested he and Tamez were merely riding around in his brother's green pickup while he cooled off after a squabble with his girlfriend. Obviously the jury chose not to believe Garcia's story, as they were entitled to do. Grasping at straws, he argues that the government did not prove that the marijuana was not already in the car furnished by "Dave." Such proof of a negative fact was unnecessary—and especially so in light of Bonnie's testimony that the car was loaned only in response to Garcia's demand that he be furnished a vehicle other than his own in which to transport the dope. Again, his was a farfetched theory totally out of harmony with the evidence presented by the government, and the jury was quite capable of assessing its merit.

■■ B. Garcia complains that the trial court erred in failing to instruct the jury on identification. Such a

charge may be appropriate if requested; however, here there was no request or objection to its omission as required by Federal Rule of Criminal Procedure 30. United States v. Esquer, 459 F.2d 431 (7th Cir. 1972), cited by appellant, holds that a jury instruction must be requested except where the failure to instruct "constitutes basic and highly prejudicial error." This is far from such an instance. Bonnie Maldonado testified that she personally participated in every step of the negotiations with Garcia and that she accompanied him while he made the trip to pick up the weed. Her testimony was amply corroborated by that of the government agents. The undercover agent who posed as George, the prospective buyer, testified to his several personal meetings with Garcia for purposes of arranging the delivery: first on the street corner, and then twice in his motel room. Two customs agents who had the hotel under surveillance testified to having witnessed Garcia's arrival at the hotel at times critical within Bonnie's description of the events: one said that he saw Garcia and Tamez go up to George's room at a time that fell within Bonnie's description of their visit to count the money; the other testified that he saw Garcia get out of the load car when it returned with the marijuana and get into one of the pickups. Garcia chose to confront all this testimony with an alibi which placed him elsewhere during each of these events. Although such a defense necessarily rested on the hope that the jury would think the prospective witnesses either mistaken or lying, the court was not bound to take it upon itself to dignify such a defense with suitable instructions. Guided by closing argument, the jurors could not have failed to comprehend that acceptance of Garcia's story would have required that they believe the prosecution witnesses wrong in their identifications.

■ C. Garcia also complains that the trial court failed to advise the jury fully of the potential unreliability of Bonnie Maldonado's testimony because of her likely expectation of leniency.

Again, no request for such an instruction was made. The court did, however, include a cautionary instruction which was quite adequate under the circumstances.[1] Tillery v. United States, 411 F.2d 644 (5th Cir. 1969), which appellant calls to our attention, is hardly helpful to his position. We there held that it is plain error not to caution the jury where the accomplice's testimony is "extremely unreliable and self-contradictory and comprises the sum total of the evidence against the defendant." This is not such a case.

■ D. Finally, Garcia urges us to find plain error in several statements made by the trial judge in his charge to the jury. He calls our attention to two instances in which the court exhibited a certain animus toward "these people

that are making marijuana available to others" and "these peddlers," terms which he fears the jury interpreted to apply to the defendants.[2] Garcia equates these statements with those in United States v. Musgrave, 444 F.2d 755 (5th Cir. 1971), which we found so prejudicial that a new trial was required despite failure to object. We do not find the indiscretion so serious. Although both statements were unnecessary, and either would have been dangerous had it been emphasized in the instructions, viewing the charge as a whole we find no real possibility of prejudice. The references to "these people" and "these peddlers" fit within the trial judge's format of explaining the law through the use of hypothetical illustrations, a technique which we find unobjectiona-

1. The court instructed the jury as follows:
 Now Bonnie Maldonado was a defendant together with these four defendants here. She has pled guilty. I think she pled guilty on February 1st or the 2nd. I don't remember exactly when. And I set her sentencing here—put her in jail and I set her sentencing here for March 12th. I haven't sentenced her. I ordered a presentence report on her. I am going to sentence her.

 Now the government is replying very heavily on the testimony of Bonnie Maldonado, also known as Charlene S. Patlos, and also known as Bumpie or Buffie, something like that.

 In connection with her testimony I charge you that Bonnie Maldonado is an admitted felon because she has been convicted before, and that she is under the law an accomplice. The government charges her with participating in this same case that these people are charged in participating. She is an accomplice under the law. She was named in the indictment as a conspirator. She gave evidence here, she has pled guilty.

 But I want to charge you that an accomplice does not become incompetent as a witness because she participated in the crime charged. On the contrary, the testimony of such person alone, testimony of Bonnie Maldonado alone, if believed by you, may be of sufficient weight to sustain a verdict of guilty even though it may not be corroborated or supported by other evidence.

 The government tells us in this case that her testimony is corroborated by agents of

the government who came here and testified. But her evidence alone, if believed by you, would be sufficient to convict if by her testimony the government has proved every essential element of the crimes charged here against these four defendants.

 However, you should keep in mind, and I instruct you, that the testimony of an accomplice and admitted felon such as Bonnie Maldonado has to be received by you with caution and weighed with care.

 The defendants tell us you can't believe Bonnie Maldonado, she is an accomplice, she is a felon, previously convicted. And the government tells us her testimony has been corroborated by testimony of other people, other agents, and you ought to believe them. That is up to you.

2. At one point the trial judge said:
 Now intent to distribute was put in there because what the government was after was these people that are making marijuana available to others.
 Further along he stated:
 And then at 9:00 o'clock agent Murray tells us Rolando Garcia and this boy Tamez, Castillo Tamez, appears in his room, and they want to know if he has the money, and that he had a flash roll—and the government does make money available, Congress appropriates money not only to pay informants but they appropriate money for these people to use as flash rolls to act as purchasers because Congress feels that it is the only way they are going to get a lot of these peddlers.

ble. In this context, we are convinced that the words were interpreted to refer generally to persons engaged in activities which the narcotics laws were designed to prohibit—a class the jury was left free to determine did not include the defendants. The cautionary instruction —that the jury is not bound by the judge's comments—the absence of which we found critical in *Musgrave,* was not expressly given; but neither was its curative effect so necessary. Several times, however, the court stressed to the jurors that they were the sole arbiters of the facts, the credibility of the witnesses, and the weight to be given testimony, and that if their recollection of the evidence differed from his, as summarized in the charge, then for them to rely on their own memories. This was sufficient, especially in the absence of an objection or request as required by Federal Rule of Criminal Procedure 30.

## II

## TAMEZ

■■ A. Tamez's claim that the evidence was insufficient for the jury to find him guilty of conspiracy, distribution, and possession with intent to distribute has no more merit than Garcia's. Bonnie Maldonado and the undercover agent who posed as the buyer George testified to his entry into the negotiations and his instrumental role in the run to pick up and deliver the dope. Despite Tamez's arguments to the contrary, this testimony was sufficient to make a prima facie case of constructive possession and the requisite intent to distribute. His trial strategy was to remain silent, call no witnesses, but attempt to cast a reasonable doubt on the government's case. That this strategy failed is not surprising. Although Garcia and his alibi witnesses included Tamez in their account of Garcia's whereabouts on the fateful night, Tamez made no attempt to account for himself or explain why Bonnie and the undercover agent testified to his full involvement. Before us, and before the jury, his counsel argued that the government did not demonstrate that

the marijuana was not already in Dave's car when it was loaned. As we explained in discussing Garcia's appeal, such an argument was properly, if unsuccessfully, addressed to the jury. It hardly creates, as a matter of law, reasonable doubt of Tamez's possession or role in the distribution.

■ B. Tamez argues that the trial judge questioned Robert Noriega, an alibi witness called by co-defendant Rodriguez, so extensively that he, by association, was denied a fair trial.' Because neither he nor any other defendant objected to the judicial cross-examination, we are asked to treat it as plain error under Rule 52(b), F.R.Crim.P., as was done in United States v. Lanham, 416 F.2d 1140 (5th Cir. 1969). Although the judge here came perilously close to assuming the role of a prosecuting attorney, we do not feel that he so abandoned his position of impartiality that he gave the jury an impression that he thought any of the defendants guilty. Viewed most severely, he was testing the recollection and motives of Rodriguez's alibi witness. Counsel for Rodriguez could have complained to the court about such an undertaking; but, since he did not, we are unwilling to find plain error. Moreover, if any prejudice flowed from this judicial examination, it was not in the direction of defendant Tamez. The challenged alibi did not pertain to Tamez. Noriega's testimony that he saw Rodriguez and his wife driving alone together in Weslaco during the critical time period lent no support to Tamez's independent defense, and its impeachment could have done him no appreciable harm.

■ C. On appeal Tamez argues that his appointed trial counsel was so incompetent that he was denied a fair trial. He complains of his attorney's advice to remain silent on a plea of not guilty and rely on the alibi presented by co-defendant Garcia, which embraced both Garcia and Tamez—a strategy which he now feels precluded him from asserting entrapment as a defense. Ineffectiveness of trial counsel is not es-

tablished merely because in retrospect appellate counsel determines that he would have handled the case differently. But, applying hindsight to this case, it appears that in light of United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a claim that entrapment resulted from police misconduct, which now seems to be his contention, would not have been a very wise course of action.

 He also argues that his trial counsel should have moved for severance and that, even in the absence of such a motion, his joint trial with three other co-conspirators, each of whom were charged with multiple counts, presented a case so complex that no jury could assess it fairly. Concerning this procedure, his appellate brief admits, "This is the law, and it is 'due process' at this time, but it is not fair." We disagree only with the last clause of this statement. As conspiracy cases go, this was a relatively simple one that was confusing only to the extent defense counsel made it so, as was their prerogative. The court would have been well within its realm of discretion in denying a motion for severance, and trial counsel was not incompetent for not making one. See the criteria for ineffective assistance of counsel in Williams v. Beto, 354 F.2d 698 (5th Cir. 1965), and MacKenna v. Ellis, 280 F.2d 592 (5th Cir. 1960).

## III

### RODRIGUEZ

 A. Rodriguez's claim of insufficiency of the evidence is not quite so meritless as that of Garcia and Tamez. He admits carrying a firearm, but he contends that it was not during the commission of a felony: i. e., he asserts that he did not distribute, possess with intent to distribute, or conspire to distribute marijuana. We conclude that there was sufficient evidence for the jury to find that he did.

The prosecution's evidence did not show that Rodriguez was in on the negotiations for the sale. It did, however,

present a sufficiently incriminating outline of his subsequent role in the conspiracy. Rodriguez was picked up by Garcia as soon as he, Bonnie and Tamez left the Holiday Inn on their way to get the dope. When the foursome stopped along the way and Garcia took over driving the car and instructed Tamez to drive the pickup, he told Tamez that Rodriguez was familiar with the plan and could show him where to stop. After the two vehicles reached Pharr and again pulled off the highway, Rodriguez climbed into the car with Garcia and left Bonnie and Tamez in the truck. When the car returned, Rodriguez and Garcia got out, and an unidentified party drove it away. When the car again appeared at the gas station, Garcia reported it loaded. Rodriguez traveled back to Harlingen with his fellow conspirators in one of the pickups. He was arrested in Harlingen in the red truck after it had been observed circling the Holiday Inn and its occupants had been seen in communication with those in the green truck. He claimed ownership of one of the pistols found in the truck, confirming Bonnie's testimony that he was armed while in Pharr.

Rodriguez's alibi completely contradicted Bonnie's description of his involvement. According to his testimony, as corroborated by that of his wife Linda and his friend Noriega, he and his wife were driving around in Weslaco until past 11:00 p. m. He had never seen Bonnie Maldonado until after the arrest and knew nothing of any marijuana deal. His first contact with any of his co-defendants was around 11:15 a. m., following an argument with his wife, when he left her with his car in LaFeria and a red pickup driven by defendant Vega picked him up hitchhiking his way back to Harlingen. According to him, he knew nothing of any illegal activities in which his benefactors might have been involved and was arrested before he took his leave of them.

 Obviously he hoped the jury would prefer his story to Bonnie's. Just as obviously they did not. Their verdict

was based on sufficient circumstantial evidence to sustain his conviction on all four counts. Contrary to his appellate argument, Bonnie's testimony constituted a sufficient evidentiary basis for a finding that he constructively possessed the marijuana. As the court instructed the jury, and as we held in Garza v. United States, 385 F.2d 899 (5th Cir. 1967), possession may be either actual or constructive. Constructive possession exists when one has dominion and control over the drug. "Such possession need not be exclusive, but may be shared with others, and is susceptible of proof by circumstantial as well as direct evidence." 385 F.2d at 901.

■ B. Rodriguez contends that he was denied a fair trial by his co-defendant's "perjury" and "incredible" alibis. This contention is absolutely meritless. Their testimony before the jury did not implicate him. Any adverse reflection cast was mutual: Rodriguez's own alibi was fully as suspect as that of his co-defendants. If his counsel feared a finding of guilt by association, he made no motion for severance. It is just as likely that he hoped the combined weight of the alibis would cause the jury to doubt Bonnie Maldonado's story. That it did not is not surprising. That he raises this point on appeal is.

■ C. Rodriguez asks us to hold that he was entrapped as a matter of law. Again his argument has no merit whatsoever. In the first place, there is absolutely no evidence that Rodriguez was "induced" within the meaning of United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Indeed, he did not waver from his alibi that he was an innocent hitchhiker who knew nothing about any marijuana transaction. Taking this stance, he would not have been allowed to claim entrapment at trial (which he did not), much less on appeal. See United States v. Newcomb, 488 F.2d 190 (5th Cir. 1974). Certainly the undercover tactics here employed were not " . . . so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . . ." Russell, 411 U.S. at 431, 93 S.Ct. at 1643, 36 L.Ed.2d at 373. See also our discussion in United States v. Register, 496 F.2d 1072 (5th Cir. 1974).

## IV

### VEGA

A. Like his co-defendants, Vega argues that the evidence was insufficient to support his conviction of distribution, possession with intent to distribute, conspiracy to distribute, and carrying a firearm during the commission of a felony. In his case, the circumstantial evidence was somewhat slim. There was no indication that Vega was involved in the negotiations with the undercover agent. In fact, Bonnie first learned that someone other than she, Garcia, Tamez, and Rodriguez was connected with the conspiracy when Garcia and Rodriguez were let out of Dave's car on the highway. But later, when the car pulled into the gas station where the other defendants waited, she recognized Vega alone behind the wheel. When Vega got out of the car and into one of the pickups and she and Garcia got into the car, Garcia reported that the marijuana had been loaded. Back in Harlingen when Bonnie and Garcia pulled the loaded car into the Holiday Inn, Garcia called out to the two trucks as they passed to park across the street. The occupants of the red pickup were seen in communication with those of the green as both generally milled around the vicinity of the Holiday Inn awaiting Bonnie's delivery of the dope and receipt of the money. When the customs officers stopped the red truck, Vega was behind the wheel with his brother-in-law, against whom charges were dismissed, and Rodriguez as passengers. Both Vega and Rodriguez were armed.

True to form, Vega, too, denied knowledge of any marijuana transaction, testified that he had never seen the undercover agent, Bonnie, or Garcia prior to his arrest, and presented an alibi which coincidentally placed him at the wrong

place at the wrong time. He made no attempt to account for Bonnie's seeing him drive Dave's car. According to his story, he was at home in Pharr all night until his pregnant wife got sick, woke him at 11:00 p. m., and sent him in his red pickup to Harlingen to bring her grandmother back. Taking his gun with him, he stopped by to get his brother-in-law to accompany him. On their way to Harlingen, at LaFeria, they picked up Rodriguez hitchhiking. When Vega stopped in Harlingen because his truck engine was misfiring, the three were arrested.

■ The jury was entitled to disbelieve this alibi. Doing so, all elements of the four offenses could properly be inferred from the government's evidence against him. The jury could quite properly, and quite likely, have found that, when Vega drove the loaded car into the gas station in Pharr and turned it over to Garcia, he possessed the dope with intent to distribute, independent of his constructive possession as a member of the conspiracy. We have discussed Rodriguez's similar argument above. This court has long held that, when there is no doubt that a conspiracy existed, only slight additional evidence is required to connect a defendant with it. Bradford v. United States, 413 F.2d 467 (5th Cir. 1969); Cohen v. United States, 363 F.2d 321 (5th Cir. 1966).

B. Vega's assertion that he was entrapped as a matter of law is foreclosed by the same reasoning as is that of Rodriguez. He did not raise the defense below. He could not have, owing to his denial of involvement. And no outrageous conduct by government agents was shown. United States v. Newcomb, 488 F.2d 190 (5th Cir. 1974); United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

■ C. Vega claims that the trial court erred in admitting into evidence the hearsay testimony of one customs agent that when he and a fellow officer arrested Vega and his companions, the fellow officer, who did not testify, handed him a pistol and told him that he had removed it from the person of Mr. Vega. It was error to admit this hearsay statement. Silence in the face of an accusation cannot, as the government seems to contend, be the basis for admitting evidence against one who has the constitutional right to remain silent. However, we find the error harmless in light of Vega's later admission from the stand, when questioned by the judge, that an officer who did not testify got the pistol out of his belt when he arrested him. Such a question from the bench was permissible clarification of Vega's own previous testimony that he took his pistol with him in the truck that night and his identification, under cross-examination by the prosecution, of one of the pistols which had been introduced into evidence as belonging to him.

## V

### SENTENCING

■ The only defendant who complains to us of events at sentencing is Rodriguez, but in investigating his complaint we have discovered error which so jeopardized substantial rights of the defendants that it must be treated as "plain error" under Rule 52(b), F.R. Crim.P.

■ In Thomas v. United States, 368 F.2d 941 (5th Cir. 1966), we held it a clear abuse of discretion for the sentencing judge to threaten the man before him with a more severe sentence if he did not "come clean" and admit his guilt. As we explained, the defendant retains important Fifth Amendment rights after the jury reaches a verdict, rights which must not be made the price of sentencing leniency. The court cannot place the defendant in the dilemma of either abandoning his Fifth Amendment rights or risking a harsher sentence. This was precisely the situation in which the trial judge placed Garcia, Tamez, Rodriguez, and Vega when they appeared before him for sentencing.

When the judge addressed each defendant, he emphasized that his primary concern was that the individual tell him

"the truth" about his involvement in the crime. The court was unambiguous in its message: "I want people to tell me the truth, see. When they don't tell me the truth, I have no compassion on them." There was similarly no chance of mistaking what the judge considered to be the truth. After listening to the interchange between the court and his co-defendants, Garcia admitted his participation in the conspiracy, but to a lesser degree than indicated by prosecution witnesses at trial, whereupon the court sympathetically stated, "Well, at least this boy is telling me the truth."

As Rodriguez points out, he was the object of the heaviest pressure to confess. After Garcia set the example, the court redirected its attention to Rodriguez:

> THE COURT: . . . The one I really feel sorry for is you, Rodriguez, but you don't want to tell me the truth.
>
> DEFENDANT RODRIGUEZ: I owe everything I have, sir.
>
> THE COURT: I'm not talking about owning things or owing. I'm talking about this case. This case here. You were involved in it or not? That is all I want to know? You were not involved in it?
>
> DEFENDANT RODRIGUEZ: I wasn't.
>
> THE COURT: All right, Well, I don't believe you.
>
> DEFENDANT RODRIGUEZ: Yes, sir. Plead for mercy then, sir.

The court then turned to Vega, who had also refused to confess, and sentenced him to three concurrent five-year terms in prison. This prompted Rodriguez to make one last attempt, short of admitting guilt, to placate the court. The court's response: "I don't like for people to make a fool out of me," and, "I just hate to have people to think they can get by with things and lie to the court"—followed by a sentence of three years in prison on each count to run concurrently.

At this point, defendant Tamez felt moved to make a qualified confession, whereupon he was sentenced under the Youth Corrections Act, pursuant to Section 5010(b), Title 18, United States Code.

Finally, Garcia was sentenced to concurrent five-year terms, with all but six months suspended.

■■■ This pattern of sentencing, coupled with the heavy pressure, raises the possibility that the court took into consideration in sentencing Rodriguez's and Vega's refusals to confess. We emphasize that this is only a possibility. The record also reflects that the judge was privy to information in the presentence report which may have indicated that more severe sentences were called for in their cases.[3] If this be so, and if such relevant information was the sole reason for the disparities, then lesser sentences may not be indicated.

■■■ We, therefore, vacate the sentences imposed on Rodriguez and Vega, thus affording the district court an opportunity to re-sentence them in accordance with this opinion. Because it clearly appears that Garcia and Tamez were not penalized, since each confessed, but were, if anything, rewarded for doing so, we do not vacate their sentences. It need scarcely be said that we have not considered their "confessions" in passing on their appeals, exacted, as they were, at the price of Fifth Amendment rights and dubious of belief in fact —in the circumstances presented, even an innocent man might have "confessed."

## VI

## CONCLUSION

Our decision in this case has been considerably delayed by a cursory and thoroughly inadequate Appellee's Brief,

3. Contrary to Rodriguez's contention, the court was not required to disclose to him the contents of the presentence report. See ■■■■ Rule 32(c)(2), F.R.Crim.P.; United States v. Arenas-Granada, 487 F.2d 858 (5th Cir. 1973), and cases cited therein.

which was of virtually no assistance in evaluating appellants' points of error.

Recognizing, as we do, the difficulties under which the typical United States Attorney's office labors, we nevertheless can only deplore the waste of slim judicial resources and the unnecessary delay which has ensued before we could with assurance, as we finally do, conclude that the convictions of all four appellants must be affirmed on all counts, but that the sentences imposed on Vega and Rodriguez must be vacated.

Affirmed in part, vacated and remanded in part.