GEWIN, Circuit Judge:
Appellant Harry Neil Kelly was tried by a jury and convicted on all counts of a three-count indictment charging violations of 18 U.S.C. §§ 2314, 2, & 371, in that he caused and conspired to cause a person to travel in interstate commerce in execution of a scheme to defraud.[1] On appeal Kelly challenges: (1) the sufficiency of the evidence to support his conviction, (2) failure to charge the jury on accomplice testimony, (3) refusal to give requested instructions, (4) denial of his motion for continuance, (5) denial of his motion for severance, (6) admission of testimony allegedly barred by the attorney-client privilege, (7) failure to grant a mistrial, and (8) failure of the government to comply with the court’s discovery order. Finding his assignments of error without merit, we affirm.
FACTS
In 1969 appellant Kelly chartered an offshore mutual fund, the Allied Fund for Capital Appreciation (AFCA) in Panama. Kelly was the president of the fund which was managed from Munich, Germany. AFCA shares were distributed by a Munich concern called Select Distributors (Select). Kelly worked as an agent for Select, which was managed by a Miss Smith and two AFCA directors, a Mr. Bennett and a Mr. Gravesteyn.[2] Kelly received funds from Select and placed them in Midwest National Bank (Midwest), an institution he had chartered in Panama through an attorney. In Kelly’s own words, Midwest was “a proof.” (R. 316). The bank’s headquarters consisted of an 18 by 24 foot room furnished with some tables and chairs, filing cabinets, a typewriter and Telex machine, and a small refrigerator. Midwest’s primary function was to serve as a depository of funds from AFCA’s largest shareholder, the KARA trust. The trust, which according to testimony was named for Kelly’s daughter Kara and controlled by Kelly as her guardian, received AFCA shares and in turn transferred funds, at least on the books, to Midwest.
AFCA itself operated by receiving money from investors throughout the world and issuing shares in the fund in return. Investments in the fund were solicited on the basis of prospectuses and financial statements representing that AFCA had millions *932 of dollars worth of blue chip securities.[3] AFCA’s assets were allegedly held by Midwest and Drabun, Inc., a New Orleans brokerage firm, according to confirmations furnished AFCA’s auditor Eric Gaeckler by Midwest and Drabun.[4] Drabun’s owner, Peter Schreiber, however, testified that he had never held any assets for AFCA, and that when he received a letter from Select asking him to verify these assets he called Kelly on the matter. Kelly replied that there was “paperwork” at the office of the fund showing that Drabun held the assets, but not to worry about it, that “[t]hey will never surface,” that “Mr. Gravesteyn had control of it.” (R. 119).
In the late spring of 1970, Gaeckler, in endeavoring to prepare a financial statement for the fund, discovered that all of its assets had been transferred to Midwest.[5] The following spring Gaeckler travelled to Panama to audit the assets allegedly held by Midwest and found nothing but a sparsely furnished room. Upon this discovery he notified Select to stop all transactions and redemptions involving AFCA. Gaeckler subsequently met Kelly in Mexico City and confronted him with what he had learned in Panama. Kelly informed him that AFCA’s assets were located in a Mexico City bank. Gaeckler visited the bank and requested a written confirmation of the assets. He never received a confirmation and eventually discovered that only a few thousand dollars remained to the credit of the fund.
This case arose out of a transaction between Kelly and William R. Ponsoldt in April of 1970, in which 200,000 shares of AFCA were exchanged for all the shares in Ponsoldt’s Schweiz-Deutseh Land Company (SDL).[6] SDL purportedly held 160 acres of property in New Jersey and a substantial amount of securities. Apparently AFCA never received the property but received shares in a company of questionable worth called Computronics. The AFCA shares were restricted from redemption for one year.
On June 28, 1970 Ponsoldt met with Harry Bloomfield, president and owner of a controlling interest in Bloomfield Building Industries (BBI), a corporation listed on the American Stock Exchange, at the Brilund Yacht Club in the Bahamas to discuss a trade of AFCA shares for Bloomfield’s controlling interest in BBI. Bloomfield trav-elled to this meeting by plane, flying from his home in Memphis, Tennessee, to Miami, Florida, where he spent the night. The next day he met Ponsoldt in Nassau and together they flew to the yacht club.
Under the terms of the trade, which had been worked out in advance of this meeting, Bloomfield was to receive approximately $2,400,000 in AFCA stock plus cash or another asset agreeable to him in return for Bloomfield’s shares in BBI. Bloomfield, however, was concerned about the restriction on the redemption of the AFCA shares. Ponsoldt assured Bloomfield that the restriction only applied to Ponsoldt, not to third party purchasers of the stock, and stated that Bloomfield could redeem the AFCA shares in seven days at the market price. Satisfied with Ponsoldt’s answer, Bloomfield concluded the contract.
*933 Bloomfield subsequently attempted to redeem the AFCA stock but was unsuccessful.[7] On November 4, 1970, he travelled from Memphis to Miami for a meeting with Ponsoldt to resolve the problem of the redemption of the AFCA shares. Present at this meeting was Kelly, whom Ponsoldt introduced as the head of the AFCA fund. When Bloomfield demanded that either the AFCA shares be redeemed or the deal be rescinded, Kelly remarked that generally when one tried to cash in stock prior to the redemption date one could only get fifty cents on the dollar. Bloomfield replied that he might accept that arrangement. Kelly and Ponsoldt then left the room to discuss the proposal. When they returned, Bloomfield was told that they would have to contact the “people” in Germany and was assured that they would get in touch with him later. No reply was ever forthcoming from Germany. In May of 1971 Ponsoldt and Bloomfield rescinded their agreement and made a settlement agreement.
I. Sufficiency of the Evidence The jury has weighed the evidence and determined the credibility of the witnesses presented by both sides in this case. Taking, as required, the view most favorable to the government, we must sustain the jury’s verdict if substantial evidence exists to support it. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).
Appellant challenges the sufficiency of the evidence under Counts I, II and III of the indictment. Both Counts I and II charge violations of 18 U.S.C. §§ 2314 and 2.[8] Section 2314 defines the substantive offense and section 2 defines the offense of aiding and abetting. Count III alleges that appellant conspired to violate section 2314. Since the sentences of three years imposed by the district court on each count are to run concurrently, if we find there is sufficient evidence to support appellant’s conviction under any one count, we need not consider the remaining counts. Hirabaya-shi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1942); United States v. Dumenigo, 444 F.2d 253 (5th Cir. 1971) (per curiam).
Appellant charges that the government has failed to demonstrate a violation of section 2314. The pertinent provision of 18 U.S.C. § 2314 states:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the ’ execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; .
Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
The statute thus requires the devising of a scheme to defraud any person of money by false representations and causing or inducing that person to travel in interstate commerce in furtherance of that scheme. Appellant contends that the evidence adduced by the government fails to satisfy these elements of the offense in that it does not show that appellant devised a scheme to defraud Bloomfield and caused Bloomfield to travel in interstate commerce in execution of such a scheme. Initially we turn to an examination of the first element of the offense — the existence of a scheme to defraud.
Appellant primarily contends that there was no evidence that AFCA was not a viable mutual fund and that the shares of AFCA transferred to Ponsoldt were worthless. We believe that there was sufficient evidence for the jury to conclude that *934 AFCA was a fraudulently created mutual fund and that its shares were worthless or nearly so. It was shown at trial that the “bank” which supposedly held the bulk of AFCA’s assets was a mere shell corporation consisting of a single room, devoid of either personnel or funds. There was testimony that the securities comprising AFCA’s portfolio were compiled by appellant and two others by selecting stock of corporations at random from the financial section of a newspaper. AFCA’s prospectus failed to mention Kelly’s connection with the fund, yet listed two individuals as directors of the fund who had no connection with the concern and never consented to have their names listed as directors. Assets of the fund were falsely confirmed with appellant’s knowledge to AFCA’s auditor by Dra-bun, Inc. Appellant’s own knowledge of the worthlessness of the AFCA shares is evidenced by his practice of distributing thousands of shares of AFCA for little or no consideration.[9] But perhaps the best indication that AFCA was a sham fund formed by Kelly and others for the purpose of defrauding investors is the fact that when AFCA’s auditor tried to locate its purported millions of dollars in assets, he found only a few thousand dollars remaining in the fund.
Appellant also contends that the government failed to satisfy the jurisdictional requirements of section 2314 under Count I of the indictment. The statute requires that a person be induced to travel in interstate commerce in furtherance of a scheme to defraud. Appellant advances the novel argument that Bloomfield in his trip from Memphis to the Bahamas moved not in interstate commerce but in foreign commerce. It is unchallenged, however, under Count II of the indictment, involving Bloomfield’s trip from Memphis to Miami in November of 1970, that Bloomfield travelled in interstate commerce. Thus, under Count II the element of interstate travel is satisfied.
Alternatively, we also find that there was sufficient evidence under Count I of the indictment to satisfy the requirement of travel in interstate commerce. The evidence shows that to reach the June, 1970 meeting with Ponsoldt Bloomfield left Memphis, Tennessee, by commercial airline for Miami, Florida, where he spent the night, and then travelled on to the Bahamas. In Charron v. United States, 412 F.2d 657 (9th Cir. 1969), the defendants induced their victim to travel from Mexico to Washington State and back to Mexico in furtherance of their scheme to defraud him. En route to and from Mexico City the victim passed through Oregon. The court held that the evidence presented by the case established that the victim had travelled in interstate commerce.
Appellant attempts to distinguish Charron from the instant case on the basis of language in the opinion stating that the defendant “knew that his victim would have to travel in interstate commerce if his scheme were to succeed.” Id. at 659. Knowledge or foreseeability of a victim’s travel in interstate commerce, however, is not a jurisdictional requisite. This issue was resolved in United States v. Ludwig, 523 F.2d 705 (8th Cir. 1975), where an examination of congressional intent led the court to conclude that “interstate transportation is merely the linchpin for federal jurisdiction and bears no relationship, in terms of culpability, to the underlying criminal acts which are the objects of § 2314, it [therefore] follows that the government should not have to prove that the interstate transport was in any way reasonably foreseeable.” Id. at 707.
Appellant also argues that there was no evidence that he specifically intended to cause and caused Bloomfield to travel in interstate commerce. Under section 2314 *935 the defendant need not have caused the transportation directly. The statutory requirements are fulfilled if it is shown that “he was a motivating force in the transportation.” Thogmartin v. United States, 313 F.2d 589 (8th Cir. 1963) (Blackmun, J.). Appellant, however, contends that there was no evidence that he was a “motivating force” behind Bloomfield’s travels. The record reveals otherwise. There was substantial evidence that appellant devised a scheme by which worthless shares in AFCA were used to obtain cash or other valuable assets. Appellant transferred thousands of these shares to Ponsoldt which the latter then offered to Bloomfield in exchange for shares in Bloomfield Building Industries, Inc. It was Ponsoldt’s offer of the AFCA shares supplied him by Kelly which induced Bloomfield to travel to the Bahamas via Miami, and it was Bloomfield’s desire to redeem these shares which led him to travel to Miami from Memphis.[10]
Appellant further argues that it is not sufficient for purposes of section 2314 to merely show that the defendant induced interstate transportation, it must also be shown that the defendant specifically intended to cause movement in interstate commerce. This argument misapprehends the nature of the interstate transportation requirement of section 2314. This requirement, as stated above, serves as the “linchpin for federal jurisdiction,” providing a constitutional basis for the exercise of federal power, Ludwig, supra, at 707, and does not mandate that the defendant know, or foresee, or intend any movement in interstate commerce. United States v. Powers, 437 F.2d 1160, 1161 (9th Cir. 1971).
In Ludwig, for example, defendant drew two checks upon his employer’s bank account in Missouri, payable to a friend. Defendant delivered the checks to his friend who deposited them in his personal account in another Missouri bank. The friend’s bank mailed the checks to its correspondent bank in Illinois, from whence the checks eventually travelled back to defendant’s employer’s bank in Missouri. The checks thus moved through interstate commerce. Defendants argued that since the government failed to show that the defendants knew that the checks would move through interstate commerce or even that it was reasonably foreseeable that they would do so, there was insufficient evidence under section 2314 for their conviction. The court, however, held that the statute contained no requirement of reasonable foreseeability of interstate transportation. Id. at 708. Thus in Ludwig, defendants were convicted under section 2314 even though they not only did not specifically intend that the checks move through interstate commerce, but lacked even a reasonable expectancy that they would do so.
Appellant’s final challenge to section 2314 involves the assertion that the statute requires the government to prove that he specifically intended to defraud Bloomfield, and that it failed to do so. Again, we find that appellant misconstrues the provisions of section 2314. The language of the applicable paragraph of the statute contains no requirement of specific intent to defraud a chosen individual but merely states that a violation occurs when “any person” is caused or induced to be transported in interstate commerce.[11]
This circuit has followed an interpretation of section 2314 which construes the statute to require a showing that “a victim was induced to travel in interstate commerce.” United States v. Scoratow, 434 F.2d 1288 (5th Cir. 1970), quoting United States v. Hassel, 341 F.2d 427 (4th Cir. 1965) (emphasis supplied). Further, a construction of section 2314 as requiring only a general intent to defraud any person who *936 might fall victim to the schemer’s plan is consistent with the construction placed on that part of the statute concerning movement in interstate commerce — that no intent to cause anyone to move through interstate commerce is required. We therefore agree with the trial judge that the statute only required that “Mr. Kelly established this scheme with the intention of defrauding anyone that happened to come along and was available for the plucking . . .”
(R. 1812).
In addition to our interpretation of section 2314, we also find that there was sufficient evidence to support a finding under Count II of the indictment that appellant intended to defraud Harry Bloomfield. Count II concerns Bloomfield’s journey of November 4, 1970, from Memphis to Miami where he met not only with Ponsoldt but with the appellant as well. As noted earlier, at this meeting appellant was introduced, without protest, as “the head of AFCA.” Appellant also raised the possibility that the AFCA shares held by Bloomfield might be redeemed at fifty cents on the dollar. When Bloomfield expressed interest in this suggestion, Kelly and Ponsoldt left the room to ostensibly confer on this redemption plan. When they returned, Bloomfield was told that Kelly would have to talk to “his people” in Germany, and that they would contact Bloomfield later. We believe that this evidence of direct participation by appellant in the meeting with Bloomfield over the issue of the redemption of Bloomfield’s AFCA shares constitutes sufficient evidence that Kelly intended to defraud Bloomfield. It is therefore our opinion that there was substantial evidence to support a conviction under either Counts I or II of the indictment.
II. Failure to Charge the Jury on Accomplice Testimony
Appellant asserts as error the trial judge’s failure to specifically charge the jury that if they found any of the witnesses who testified to be accomplices of the appellant, their testimony should be carefully scrutinized. In Williamson v. United States, 332 F.2d 123 (5th Cir. 1964), this court reversed a conviction where the trial court failed to charge the jury on accomplice testimony even though, as here, the charge was not requested. In Williamson, however, the government’s entire case rested upon the testimony of a single accomplice. The case before us presents an entirely different situation. Here, the government’s case consisted of testimony not only of individuals who may have been the appellant’s accomplices but also of testimony by persons who were not accomplices. Also, in the instant case, the trial judge provided the jury with instructions on the testimony of witnesses which we believe were adequate in the circumstances. See United States v. Rodriguez, 498 F.2d 302, 307-08 (5th Cir. 1974).
III. Refusal to Give Requested Instructions
The trial court refused to instruct the jury that it was necessary to prove that appellant specifically intended to defraud Bloomfield. This refusal does not constitute error, since, as we have held in the first section of this opinion, 18 U.S.C. § 2314 does not require that the fraud be aimed at a specific individual.
Appellant also contends that the trial court erred in refusing to instruct the jury that:
[I]f you do not find any overt act committed by HARRY NEIL KELLY, in furtherance of defrauding Harry Bloomfield of money or property in excess of $5,000.00, you must find the Defendant Not Guilty. (R. 157).
This instruction concerns the conspiracy count which, as stated above, we have not felt required to rule upon. However, we note that the requested instruction misstates the law, which, as stated by the trial judge, requires that one of the conspirators knowingly committed one of the overt acts charged in the indictment. See United States v. Pearson, 508 F.2d 595 (5th Cir. 1975); United States v. Diez, 515 F.2d 892, 895 (5th Cir. 1975).
*937 IV. Refusal to Grant Continuance
Appellant assigns as error the trial court’s refusal to grant a continuance until Ponsoldt could be served with a subpoena. The law in this area has been thoroughly explicated by this court in United States v. Uptain, 531 F.2d 1281 (1976). Briefly, the disposition of a request for continuance rests within the trial court’s discretion. Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); United States v. Gidley, 527 F.2d 1345 (5th Cir. 1976). Absent an abuse of discretion that disposition will not be disturbed on appeal. United States v. Uptain, supra, at 1285; United States v. Miller, 513 F.2d 791 (5th Cir. 1975). The validity of the trial court’s ruling must be decided according to the circumstances presented by each case, with particular emphasis upon the reasons presented to the judge at the time of the denial of the request. Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). In this circuit we have formulated a general rule for-review of denials of requests for continuances.
A movant must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of the continuance would materially prejudice the defendant.
United States v. Miller, 513 F.2d 791, 793 (5th Cir. 1975).
Appellant first attempted to subpoena Ponsoldt on the morning following the trial court’s grant of Ponsoldt’s motion for judgment of acquittal. (R. 1523). There was some problem with getting the marshal’s office, which claimed it required three days notice prior to service, to accept the subpoena. But the trial judge sent his clerk to expedite service. (R. 1558). The marshal’s office, however, was unable to locate Ponsoldt (R. 1652,1727,1767-68) who may have been evading service of the subpoena. (R. 1672). After attempting for five days with no success to locate Ponsoldt the defense moved for a continuance. The court denied the motion on the grounds that Ponsoldt could have been served while he was in the courthouse and secondly, that it appeared likely that it would take months to locate him. (R. 1770-71).
In these circumstances we conclude that the trial judge did not abuse his discretion in refusing to grant a continuance. Appellant had an excellent opportunity to serve Ponsoldt immediately after Ponsoldt had been acquitted and failed to do so. Nevertheless, the trial judge did everything in his power to see that Ponsoldt was served. There was evidence that Ponsoldt was unavailable and unwilling to testify. See United States v. Miller, supra. Counsel for Kelly stated that Ponsoldt was deliberately evading service of the subpoena (R. 1672) and that Ponsoldt’s attorney had advised Ponsoldt not to testify. (R. 1672, 1770). Appellant’s counsel also admitted that it might take months to serve Ponsoldt. (R. 1770). Finally, it appears that one of the main reasons the defense wanted Ponsoldt present at trial was to authenticate signatures (Ponsoldt and Gravestyn) on two documents, defendant’s exhibits 37 and 40, which the defense wished to place into evidence. (R. 1671). The government subsequently withdrew its objections to these exhibits and defense counsel replied, “[t]hat solves the problem with reference to Mr. Ponsoldt.” (R. 1727). We therefore find that in these circumstances, where appellant in his motion for a continuance provided the court with no reasons why Ponsoldt’s testimony was critical to his case and where he made no showing that Ponsoldt could ever be served, or if served would be willing to testify, the trial court did not abuse its discretion in denying appellant’s request for a continuance.
V. Refusal to Grant a Severance
Appellant claims that the court erred in denying his motion for severance because that denial prevented him from obtaining the testimony of co-defendant Ponsoldt, whom appellant claims was willing to testify until his judgment of acquittal was granted. This court, however, is at a loss to *938 determine when, if ever, that motion was made. The government has been unable to locate it and appellant in his brief does not furnish a record citation. Appellant’s counsel, pursuant to a request by this court at oral argument, has written a letter stating:
In the original transcript of the trial at page 11, line 23, trial attorney indicates that there is a Motion for Severance pending in this matter. On page 19, line 19, the trial court denies such Motion for Severance.
The trial record is void of any written request for Motion for Severance, yet in the transcript between pages 11 and 19, there is reference to the pending Motion and the government’s response thereto.
We have examined that portion of the record cited by appellant’s counsel and find that it discloses two separate motions for severance made not by appellant’s counsel but by co-defendant Ponsoldt’s counsel. There is no indication that appellant’s counsel moved for severance at this time or on any other occasion.
However, in the circumstances of this case, even had this alleged motion been made, its denial would have been proper. The denial of a motion for severance is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. Opper v. United States, 348 U.S. 84, 85, 75 S.Ct. 158, 160, 99 L.Ed. 101, 109 (1954). The general rule, especially in conspiracy cases, is that persons jointly indicted should be tried together and that severance should not be granted absent a showing of the most compelling prejudice. United States v. Perez, 489 F.2d 51, 65 (5th Cir. 1973). Here, appellant has made no showing of such prejudice. Appellant complains that denial of his motion prevented Ponsoldt from testifying in his behalf. However, upon Ponsoldt’s acquittal he was subject to subpoena and appellant had the opportunity to have him properly served. He failed to act until Ponsoldt was absent. We therefore find no merit in appellant’s contention.
VI. Attorney-Client Privilege
Appellant contends that Daniel Cohen should have been barred from testifying against him because of the attorney-client privilege. No attempt to invoke the privilege was made at trial, but prior to trial appellant did file a motion to exclude Cohen as a witness. The record does not reveal the court’s ruling on this motion, but since Cohen was allowed to testify the motion apparently was denied.
In order to invoke the attorney-client privilege the claimant must establish the following elements:
(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.
In re Grand Jury Proceedings, 517 F.2d 666, 670 (5th Cir. 1975), quoting United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358-59 (D.Mass.1950). The burden of proof is on the individual asserting the privilege to demonstrate an attorney-client relationship. C. McCormick Evidence, § 88, p. 179 (Cleary ed. 1972). Here, we find that appellant Kelly has not met this burden.
It is true that Cohen testified that he was a member of the New York Bar (R. 1279) and was employed as an attorney by AFCA. (R. 1279, 1282). However, beyond these facts no evidence has been presented by appellant of any attorney-client relationship between appellant and Cohen. As the government points out in its brief, when Cohen took the stand appellant could have examined him on the attorney-client issue but failed to do so. The trial judge, therefore, did not err in permitting Cohen’s testimony.
*939 VII. Failure to Grant a Mistrial
On two separate occasions appellant’s counsel moved for a mistrial on the grounds that the prosecution had placed appellant’s character in issue. The motions were denied and appellant now asserts the denial of those motions was error.
Appellant’s initial motion on this ground arose out of the following question asked by the prosecution on redirect of its witness Eric Gaeckler.
Could Mr. Kelly have sold AFCA stock in the United States without proper authority and you simply not have known about it? (R. 729-30).
Appellant’s counsel made an objection to this question, as calling for an opinion. The objection was sustained and counsel then asked the court to instruct the jury to disregard the question. The court replied:
Well, I think the jury understand that if I sustain an objection, there has been, in fact, no question and no answer. (R. 730).
Appellant then moved for a mistrial on the grounds that the government stated that appellant had committed the illegal act of selling AFCA shares in the United States.
We first note that the government’s question does not state that Kelly committed the illegal act but merely asks the witness if Kelly could have committed it without his knowledge. Secondly we note that appellant’s counsel explored this issue on cross-examination of Gaeckler.
Q. To the best of your knowledge, was any attempt made to sell stock in the United States?
A. I don’t think so. I don’t know it.
Q. In fact, there was no attempt made to sell any stock of AFCA in the United States; isn’t that a fact?
A. Yes.
Q. Isn’t it a fact that Mr. Kelly never sold any stock whatsoever of AFCA. . in the United States?
A. Not in the United States.
* * * * * *
Q. [I]sn’t it illegal to trade stock in the United States that is not registered?
A. That’s correct.
(R. 686-87). Finally, we believe that whatever prejudicial effect appellant imagines the prosecution’s question had on his case was cured by the court’s reply to defense counsel’s request that the court instruct the jury to disregard the question.
Appellant’s second allegation of prosecutorial misconduct is even more frivolous than his first. In that instance the prosecutor stated: “We will stipulate that [the government’s chief witness] Mr. Schreiber is the kind of person who would become involved in a fraud.” (R. 1724). At defense counsel’s request the court instructed the jury to disregard the prosecutor’s comment. Defense counsel then moved for a mistrial which motion the court denied. The trial judge later expressed his surprise at this motion for a mistrial because, “I thought . . isn’t that what you are trying to prove, that he [Schreiber] was a phony?” We concur in the lower court’s surprise at this motion, and are further surprised that this issue, which we find wholly without merit, should be raised on appeal.
VIII. Failure to Comply with Discovery Order
The government inadvertently failed to supply appellant with a copy of a document it had decided to introduce at trial, although Ponsoldt’s counsel had requested and was provided with a copy. When this oversight was brought to the government’s attention, appellant’s counsel was given a copy. On counsel’s objection, however, the court prohibited the government from placing the document into evidence. We fail to see, and appellant gives no reasons, how he was prejudiced by a document which the court refused to allow the government to introduce into evidence.
The judgment is AFFIRMED.

. William R. Ponsoldt, Kelly’s codefendant, was indicted on the same counts. At the close of the government’s case Ponsoldt moved for a judgment of acquittal which the court granted.

. Some and perhaps all of these individuals were involved to varying degrees in looting AFCA.

. Peter Schreiber, the government’s chief witness, testified that the portfolio of stocks listed in AFCA’s financial statement of March 31, 1970, was a false portfolio; stocks listed in it had been selected at random from the financial section of a paper by Kelly, his accountant Tony Pitman, and Schreiber (R. 94-95).

. A confirmation consists of a request by a company to the person or entity holding its assets to confirm that holding of assets to the auditor. (R. 474).

. On November 12, 1970, a letter was mailed to Drabun from Select, requesting Drabun to confirm to Gaeckler the assets held by Drabun for AFCA as of September 30, 1970. (Gov.Exh. 4). On November 30, 1970, Schreiber replied in a letter dictated by Kelly that Drabun was not holding any securities for AFCA. (Gov.Exh. 5). Schreiber testified that Kelly told him: “As you know, you are not holding any collateral for AFCA. Therefore, I have got to move it so that the German group will have the continuity of these supposed assets, and I am going to switch them down to Panama.” (R. 135).

. The stock in Schweiz-Deutsch was owned by Die Firma Besenbruch which was in turn owned by Munchen-Nassau Trading Co., Ltd.; all companies owned by Ponsoldt.

. There was testimony by AFCA’s attorney, Daniel Cohen, that the registrar of AFCA had no record of issuing some of the shares offered by Bloomfield for redemption. (R. 1293).

. Counts I and II are largely identical except that Count I concerns Bloomfield’s June 1970 trip to meet Ponsoldt, while Count II concerns his journey from Memphis to Miami in November, 1970.

. Schreiber, for example, testified that he received 8,000 shares of AFCA from Kelly for providing the fund with advice during a short stay in Germany with Kelly. At the time the stock was quoted at approximately $11 a share. (R. 72-80). According to Schreiber Kelly also distributed AFCA stock to Jerry Yanks, “to do some good with it,” to Carmen Lambardosi, who “said he would like to make a hit with it,” and to Peter Crosby, who told Kelly he could use assets for his company. (R. 97-101).

. The fact that Kelly acted through an innocent intermediary does not immunize him from guilt. See United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937).

. In a case involving the first paragraph of section 2314, interstate transportation of stolen goods, the Second Circuit stated, “It would seem that only a general criminal intent is necessary to violate 18 U.S.C. § 2314.” United States v. DeKunchak, 467 F.2d 432, 436 (2d Cir. 1972).