UNITED STATES of America, Appellee,

v.

**Louie Co GUNTER, Appellant.**

**No. 79-2039.**

United States Court of Appeals, Eighth Circuit.

Submitted April 18, 1980.

Decided Oct. 15, 1980.

Wilfred C. Rice, Detroit, Mich., for appellant.

Kenneth F. Stoll, Asst. U. S. Atty., Little Rock, Ark., for appellee.

Before STEPHENSON, Circuit Judge, KUNZIG,* Court of Claims Judge, and McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Louie Co Gunter appeals from a final judgment entered in the District Court [1] for the Eastern District of Arkansas upon a jury verdict finding him guilty of two counts of interstate transportation of a stolen motor vehicle (counts I and III) in violation of 18 U.S.C. § 2312 and two counts of selling and disposing of a stolen motor vehicle (counts II and IV) in violation of 18 U.S.C. § 2313. The trial court sentenced appellant to three terms of six months imprisonment on counts I, II and III, to be served concurrently. The trial court suspended sentence as to count IV and placed appellant on thirty months probation to begin on the expiration of the prison terms.

For reversal appellant argues that the trial court erred in (1) refusing to dismiss the indictment, (2) improperly assuming the role of an advocate during the course of the trial, (3) granting the prosecution a continuance in order to develop additional evidence, (4) refusing to grant appellant's motion for judgment of acquittal, and (5) improperly conducting an evidentiary hearing in the absence of appellant. Appellant further argues that the evidence was insufficient to support the verdict.

For the reasons discussed below, we affirm the judgment of the trial court.

FACTS

This case involves the sale and delivery of two 1977 Lincoln Continental Mark V automobiles. The theory of the prosecution was that the cars were stolen in Michigan and that appellant then sold the cars through a third party, A.L. Scott, to individuals in Arkansas and drove the cars from Michigan to Arkansas.

Car # 1, VIN (Vehicle Identification Number) 7Y89A970966, was the car involved in counts I and II. Bobby Gene Davis bought this car from a Lincoln dealership in Detroit, Michigan, on September 2, 1977. Davis, an Oklahoma resident, was in Detroit visiting his brother. Davis reported the car was stolen from his brother's driveway on September 6, 1977. Davis had left the car papers in the glove compartment but obtained photocopies from the dealership. The car's VIN was written on the saleslip from the dealership.

At the end of September 1977, in Arkansas, Roger Burke bought car # 1 from a man who identified himself as "Mr. Gunter." Burke testified that appellant looked like "Mr. Gunter." The sale had been arranged through A.L. Scott. Gunter knew Scott because they had worked together on a construction project in Arkansas in 1975; Scott was a business acquaintance of Burke's. "Mr. Gunter" gave Burke a Michigan certificate of title which indicated the owner was a Michael Gunter, of 6148 Commonwealth, Detroit, Michigan. Burke attempted to register the car in Arkansas and discovered that the Michigan title was invalid. An Arkansas State Police investigation revealed that the car's VIN was 7Y89A970966, matching the VIN of the car stolen from Bobby Davis.

Car # 2, VIN 7Y89A852467, was a Ford Motor Company car assigned to company executive John Sattler for his personal use. Sattler had made arrangements to pick up the car at the Detroit airport upon his return from a business trip to California in July 1977. Sattler arrived at the airport but was unable to find his car.

In late August 1977, Beverly Yates purchased car # 2 in Detroit. Yates testified that she purchased the car from a black man in his late 20's, about 5'8" tall and weighing about 145 pounds. She further

---

* The Honorable Robert L. Kunzig, Judge, United States Court of Claims, sitting by designation.

1. The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

testified that she had never seen appellant and was unable to remember the name of the man who sold her the car. Yates' car registration papers reflect that the car's VIN was 7Y89A848547. She further testified that the car was stolen on September 29, 1977.

In early October 1977, Boyce Cranford purchased car # 2 from a man who identified himself as "Robert Young." Cranford was a business partner of Roger Burke and similarly acquainted with A.L. Scott. Cranford was interested in the same kind of car deal. The sale was arranged through Scott. Cranford testified that a man who identified himself as "Robert Young" gave him a Michigan registration, a Michigan certificate of title and a no–fault insurance form. The VIN on these papers was 7Y89A848547. Cranford was·unable to identify the man who sold him the car but, in response to questions asked by the trial court, described the man as black, 5'10" tall, rather thin, relatively small and very nervous.

An official from the Michigan Department of State testified that Cranford's Michigan title, like Burke's, was invalid. In addition, William T. Bowling, a retired employee of the National Automobile Theft Bureau, testified that he examined car # 2 and found the true VIN was 7Y89A852467, matching the VIN of the company car originally assigned to Sattler. Car manufacturers evidently place a duplicate VIN on a relatively inaccessible part of a car, thus making the location and alteration of this VIN more difficult.

Scott's identification testimony was less than positive. Scott testified that appellant did not look much like Gunter, that he had not seen Gunter for more than two years, that he had worked with Gunter about a year in 1975, and that appellant had changed a lot if he was Gunter. In response to questions asked by.the trial court, Scott testified about his work experience with Gunter, the employer (Highway Dump Haulers), and how the sales were arranged.

By this time it was about 3:30 p. m. on the first day of trial. The trial court granted the prosecution a brief continuance until 11:00 a. m. the following day to develop additional identification evidence. At 11:40 a. m. the next morning, the trial court met in chambers with the prosecutor and the defense counsel. The subject of discussion was the additional identification evidence sought to be introduced by the prosecution. Trial resumed at approximately 12:15 p. m. FBI agent Charles Poplinger testified that he had interviewed appellant in Detroit and that during the interview appellant provided his Social Security number (250–46–1843) and his address as 6148 Commonwealth, Detroit, Michigan. This was the address on the invalid Michigan title given by "Mr. Gunter" to Roger Burke. Marilyn Johnson, the secretary–treasurer and accountant of Highway Dump Haulers, testified as the business records custodian of that company and produced a W–4 tax withholding form for "Louie C. Gunter," of a local Arkansas address, Social Security ·number 250–46–1843.

The jury found appellant to be guilty on all four counts. This appeal followed.

## I. *Dismissal of Indictment*

 Appellant argues that the trial court erred in refusing to dismiss the indictment. Appellant argues that the grand jury did not have probable cause to issue the indictment because none of the witnesses before the grand jury identified appellant as the perpetrator of the crimes under investigation. We disagree. Appellant failed to raise this challenge to the indictment before trial as required by Fed.R. Crim.P. 12(b)(2). More importantly, appellant cannot challenge an indictment valid on its face on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Furthermore, A.L. Scott identified appellant by name in his testimony before the grand jury. It cannot be said that the grand jury in the present case indicted "a person totally unknown and as yet unconnected by any known evidence

with the offense." *United States ex rel. Curtis v. Warden of Green Haven Prison,* 329 F.Supp. 333, 335 (E.D.N.Y.1971), *aff'd,* 463 F.2d 84 (2d Cir. 1972). *Cf. United States ex rel. Mouquin v. Hecht,* 22 F.2d 264, 265 (2d Cir. 1927) ("The jurors do not indict the man who committed the crime, but him described in the evidence before them. ... They are to be understood, therefore, as indicting the persons described in the testimony, if doubt arises. Hence, if it be shown that the witnesses described the person arrested, he is the person indicted."), *cert. denied,* 276 U.S. 621, 48 S.Ct. 301, 72 L.Ed. 736 (1928).

## II. Trial Judge as Advocate

Appellant next argues that the trial judge improperly assumed the role of an advocate on behalf of the prosecution during the course of the trial. *See United States v. Lanham,* 416 F.2d 1140 (5th Cir. 1969). The prosecution contends that the trial judge in questioning the witnesses was merely discharging his duty to clarify the witnesses' testimony. *E. g., United States v. Harris,* 546 F.2d 234, 238 (8th Cir. 1976); *United States v. McColgin,* 535 F.2d 471, 474–75 (8th Cir.), *cert. denied,* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 128 (1976); *Scruggs v. United States,* 450 F.2d 359, 361–63 (8th Cir. 1971), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972); *Kramer v. United States,* 408 F.2d 837, 841 (8th Cir. 1969); *Ray v. United States,* 367 F.2d 258, 260–63 (8th Cir. 1966), *cert. denied,* 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785 (1967). Further, the prosecution notes that appellant made no objection to the trial judge's questioning of the witnesses and the trial judge expressly cautioned the jury in the instructions that his comments or questions were not intended to indicate his view of the facts of the case.

■ We note preliminarily that we must consider appellant's allegation of error under the plain error rule. However, we do understand why defense counsel was reluctant to make objections during trial and thus risk antagonizing the trial court and alienating the jury. Further, we do not consider the giving of the cautionary instruction to be dispositive.

■ This is a very close question. On the one hand, the trial judge should never assume the role of an advocate. Such a course, especially given the stature of the trial judge in the eyes of the jury, can very easily prejudice the rights of the parties, particularly the rights of criminal defendants. *See United States v. Lanham, supra,* 416 F.2d at 1144. On the other hand, a federal trial judge may question the witnesses. *See Kramer v. United States, supra,* 408 F.2d at 841. In fact, the trial judge may call and question a witness not called by either party. *See United States v. Lanham, supra,* 416 F.2d at 1144, *citing Gomila v. United States,* 146 F.2d 372 (5th Cir. 1944). Judicial questioning of witnesses is frequently an attempt to clarify witnesses' testimony.

> One of the chief roles of the trial judge is to see that there is no misunderstanding of a witness's testimony. The judge has a duty to comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligent manner. A trial judge can do this in a fair and unbiased way. His attempt to do so should not be a basis [for] error. Where the testimony is confusing or not altogether clear, the alleged "jeopardy" to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of facts rather than verdicts of confusion.

*Ray v. United States, supra,* 367 F.2d at 261 (citations and footnote omitted).

■ We have thoroughly examined the entire record and are satisfied that the trial judge in questioning the witnesses was merely trying to clarify their testimony. Most of the trial judge's questions were directed to further explaining the mechanics of the rendezvous between the seller and buyer and the actual delivery. We are somewhat concerned with the trial judge's identification questions asked to Roger Burke and Boyce Cranford (*see* Appendix

A) and the employment questions asked of A.L. Scott (*see* Appendix B). We conclude, however, that when reviewed in context these questions were neither improper nor prejudicial. The trial judge carefully refrained from making any comment on the evidence presented in the case and expressly instructed the jury that none of the trial judge's questions were intended to influence the jury in any way.

### III. Granting a Continuance

Appellant next argues that the trial court abused its discretion in granting a continuance to the prosecution to develop additional circumstantial evidence on the issue of identification. The prosecution argues that the trial court did not abuse its discretion in granting a brief continuance in view of the surprisingly weak identification testimony by A.L. Scott, the chief prosecution witness. Further, the prosecution argues that the evidence introduced following the continuance was descriptive and essentially neutral in character, consisting of appellant's name, address and Social Security number. *Cf. United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplars compelled by grand jury); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplars); *California v. Byers*, 402 U.S. 424, 432, 91 S.Ct. 1535, 1539, 29 L.Ed.2d 9 (1971) (disclosure of name and address characterized as essentially neutral act); *United States v. Turner*, 565 F.2d 539 (8th Cir. 1977) (routine personal identification); *United States v. Camacho*, 506 F.2d 594 (9th Cir. 1974) (production by defendant of military identification card); *United States v. Leal*, 460 F.2d 385 (9th Cir. 1972) (identification of oneself), *cert. denied*, 409 U.S. 889, 93 S.Ct. 154, 34 L.Ed.2d 146 (1972). Of course, we note that this "essentially neutral" identification evidence tended to corroborate the prosecution's theory of the case.

■ We find no abuse of discretion. *E. g., United States v. Little*, 567 F.2d 346, 348 (8th Cir. 1977), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1608, 56 L.Ed.2d 60 (1978). The trial court granted the continuance to enable the prosecution to present additional identification evidence in view of the surprisingly equivocal in–court identification by A.L. Scott, the chief prosecution witness. The additional evidence presented was essentially neutral in character. In addition, the length of the continuance was brief (from approximately 3:30 p. m. on the first day of trial to 11:40 a. m. the next day).

### IV. Sufficiency of the Evidence

■ Appellant next argues that the trial court erred in refusing to grant his motion for judgment of acquittal. Related to this allegation of error is appellant's challenge that the verdict was against the great weight of the evidence. Appellant specifically argues there was insufficient evidence of interstate transportation and identification.

There is no doubt that the evidence presented was not overwhelming. Nonetheless, we have carefully reviewed the record and, considering the evidence in the light most favorable to the verdict, conclude that the evidence was sufficient to support the verdict. The prosecution presented evidence establishing that both cars were stolen (evidently car # 2 was stolen twice) in Michigan in September 1977. Shortly thereafter, both cars turned up in Arkansas in late September–early October 1977, allegedly transported there by appellant. "We have repeatedly held that possession in one state of property recently stolen in another state, if not satisfactorily explained, is a circumstance from which a jury may infer that the person knew the property to be stolen and caused it to be transported in interstate commerce." *United States v. Brown*, 535 F.2d 424, 430 (8th Cir. 1976), *citing United States v. Harris*, 528 F.2d 1327, 1331 (8th Cir. 1975). The record further shows that Roger Burke identified appellant as the individual who sold him car # 1. A.L. Scott was unable to positively identify appellant but testified about his acquaintance with appellant, their employer, Highway Dump Haulers, and their communications in arranging the sales of the cars. His testimony was corroborated in part by the W–4 withholding form.

## V. *Evidentiary Hearing*

Appellant finally argues that the trial court erred in conducting an evidentiary hearing in the absence of appellant. As noted earlier, the trial court conducted an in–chambers proceeding about the additional identification evidence which the prosecution sought to introduce. Appellant argues that this proceeding was in fact a supplemental suppression hearing and thus a stage of the trial at which appellant should have been present. Fed.R.Crim.P. 43(a); *United States v. Hurse*, 477 F.2d 31, 33 (8th Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 245, 38 L.Ed.2d 146 (1973); *cf. Jackson v. Hutto*, 508 F.2d 890, 891 (8th Cir. 1975) (per curiam) ("Because a defendant's right to be present is, in the federal context, guaranteed by Fed.R.Crim.P. 43, the federal courts have, typically, not been called upon to determine the precise constitutional dimensions of this right. Nevertheless, there appears little doubt that a defendant's right to be present is constitutionally grounded in either the right to confrontation of the sixth amendment or the right to due process of the fifth and fourteenth amendments.") (citations omitted).

■ The prosecution notes that the record of the in–chambers proceeding does not indicate that appellant was not present. The prosecution argues that if appellant was in fact absent, defense counsel made no objection to appellant's absence and has thus waived any claim of error. *See United States v. Jones*, 542 F.2d 186, 213 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). We agree. The record of the in–chambers proceeding indicates that defense counsel expressly objected to the trial judge's evidentiary rulings but not to appellant's absence from the proceeding (Tr. 165). *See United States v. Brown*, 571 F.2d 980, 987 (6th Cir. 1978); *United States v. Sinclair*, 438 F.2d 50, 52 (5th Cir. 1971), *citing Deschenes v. United States*, 224 F.2d 688, 693 (10th Cir. 1955).

■ In addition, we would not characterize the in–chambers proceeding at issue as a stage of the trial but as a conference upon a question of law, at which the defendant need not be present. Fed.R. Crim.P. 43(c)(3); *e. g., Cox v. United States*, 309 F.2d 614, 616 (8th Cir. 1962).

■ In any event, we can find no prejudice to appellant. The evidence introduced was "essentially neutral" identification information (name, address and Social Security number) and in part documentary (the W–4 withholding form containing similar identification information).

The general rule is that both the defendant and his counsel have the right to be present at all stages of the trial, from arraignment to verdict and discharge of the jury. However,

> the existence of a right to be present depends upon a conclusion that absence could, under some set of circumstances, be harmful. Due process does not assure "the privilege of presence when presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts*, 1934, 291 U.S. 97, 106–07, 54 S.Ct. 330, 332, 78 L.Ed. 674 (Cardozo, J.)

Thus, a failure to comply with the automatic presence rule does not call for automatic reversal.

> [E]ven improper exclusion of a defendant from a "critical" portion of the trial does not automatically require reversal, if in the particular case the defendant's absence was harmless beyond a reasonable doubt.

*United States v. Walls*, 577 F.2d 690, 698 (9th Cir. 1978) (other citations omitted), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978), *citing Polizzi v. United States*, 550 F.2d 1133, 1138 (9th Cir. 1976) (other citations omitted); *see also Faretta v. California*, 422 U.S. 806, 819 n.15, 95 S.Ct. 2525, 2533 n.15, 45 L.Ed.2d 562 (1975) (that the right to be present granted by Fed.R. Crim.P. 43(a) is broader than that granted by the Constitution, which is only the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings . . . ."); *United States v. Brown, supra*, 571 F.2d at 986.

Accordingly, the judgment of the trial court is affirmed.

## APPENDIX A

*Testimony of Roger Burke:*

BY [the Assistant U.S. Attorney]:

Q Who is this Mr. Scott? Do you know his full name?

A Yes, sir. Mr. A. L. Scott.

Q Okay. He worked with you; is that right?

A Well, he was in conjunction with our work. He was working for another subcontractor on our job.

THE COURT: He talked with you and then what happened?

THE WITNESS: He told me—

THE COURT: Don't say what he told you. What happened next?

THE WITNESS: They brought me a car down from Michigan.

THE COURT: Who's they?

THE WITNESS: Mr. Gunter and Mr. Scott.

THE COURT: When was this? Do you remember?

THE WITNESS: I think it was in September of '77.

THE COURT: Do you recall when you first saw the car?

THE WITNESS: Yes, sir.

THE COURT: Where were you?

THE WITNESS: Mr. Scott called me from Cabot and I went up there and met them at a cafe in Cabot.

THE COURT: Whom did you meet?

THE WITNESS: Mr. Scott and Mr. Gunter.

THE COURT: At the cafe with the car that you bought?

THE WITNESS: Right.

THE COURT: All right, [Assistant U.S. Attorney], go ahead.

\* \* \* \* \* \*

Q [By Defense Counsel on cross—examination]: Now, when the FBI agents contacted you about the car, you gave him a description, I believe, did you not, of the person with whom you had had contact with concerning this car and you told them that that person was a Negro male five feet ten to five feet eleven inches tall; is that right?

A Yes, sir, that was.

Q How tall are you, sir?

A Five foot nine.

Q So then this person with whom you had some dealings with would have been a little taller than you? Is that right?

A Well, you know, I just gave them a description. It should have been.

Q You knew how tall you were.

A Right.

Q If the person was five feet eleven, he'd have to be at least a couple of inches taller than you; is that right?

A He should have been, yes, sir.

[Defense Counsel]: Would you stand up Mr. Gunter.

Would you say that this gentleman here is taller than you?

THE WITNESS: No, sir.

THE COURT: Wait just a minute. Why don't you walk over there and let's just see how you all compare since you brought up the issue.

All right. The jury has seen it. Now you may sit back down.

*Testimony of Boyce Cranford*

BY [the Assistant U.S. Attorney]:

Q Sir, can you identify the person who sold you the car?

A No, sir, not positively.

[Assistant U.S. Attorney]: Okay. Pass the witness.

THE COURT: Why don't you describe the person who sold you the car.

THE WITNESS: He was a colored male, about 5'10", rather thin. The best thing I remembered about him, he sweated or perspired profusely, most all the time. He was a relatively small man.

THE COURT: Relatively what?

THE WITNESS: Small.

THE COURT: Who was there? You and Mr. Burke and this gentleman?

THE WITNESS: No, sir. Mr. Burke was not there. Me and Mr. Scott, the man

that delivered the car, and a woman was with him, who was supposedly a relative of his.

THE COURT: Mr. Scott was the one that put you in touch?

THE WITNESS: Yes, sir. Mr. Scott is.

### APPENDIX B

*Testimony of A.L. Scott*

Q [By the Assistant U.S. Attorney]: Do you know Mr. Cranford?

A Yes, sir.

Q Do you know Mr. Burke?

A Yes, sir.

Q Do you know Mr. Gunter?

A Well, I thought I did. This man doesn't look that much like him.

Q Okay. Do you know this gentleman?

A If he's not Mr. Gunter, I don't know who he is. It's been two years since I've seen him.

Q How well do you know him?

A He worked off and on with me for close to a year.

Q Did you arrange any type of sales of vehicles between Mr. Gunter and Mr. Cranford and Mr. Burke?

A Mr. Gunter called me and told me he had a car that he needed to sell. Mr. Burke was talking to me and I mentioned it and he said he'd like to have it. And about a week later, four or five days later, the car was delivered and Mr. Burke bought it.

Q How was the car delivered?

A Mr. Gunter was driving it when I seen it. I met him at Protho Junction and we went from there to Cabot to Mr. Burke's residence.

Q What type of car was it?

A It was a blue Mark V with a tan or beige colored top.

Q You met Mr. Gunter? Where did you meet him?

A At Skelley's truck stop in Protho Junction.

Q Okay speak up loud so these folks over here can hear you. At Protho Junction?

A Yes, sir.

Q And then where did you proceed?

A Went to a cafe at Cabot. Had a cup of coffee with Mr. Burke and then went from there to his house.

Q At the time was Mr. Gunter driving the vehicle?

A Yes, sir.

Q Was he driving his Lincoln?

A Yes, sir.

Q Can you describe it for us? The Lincoln?

A Two door hardtop, blue–tan over blue, Mark V. Had all the accessories, sun roof, AM/FM radio, power windows, so on and so forth, like all Mark Vs, I presume.

Q Now, can you tell the Court whether it was this man here that you went up there with?

A In two years time if it's the same man, he's changed a lot, sir.

Q You are saying this is not Mr. Gunter?

A I'm not saying that. I can't be positive. He's definitely changed in two years time.

Q Did you not identify this gentleman earlier today?

A No, sir.

Q To one of the agents of the FBI?

A I said it looked like him.

Q Have you ever expressed any hesitation about identifying him before?

A No, sir.

Q In fact, you've testified before the Grand Jury, have you not?

A And, in fact, today I told you I wouldn't have no trouble identifying him.

Q Who is the Mr. Gunter that you're talking about?

A If this is not him, he's not in the courtroom, sir.

THE COURT: What was that statement?

THE WITNESS: I said if this is not him, he's not in the courtroom.

BY [the Assistant U.S. Attorney]:

Q You say you worked with this Mr.–

A Off and on for close to a year, yes, sir.

THE COURT: Where?

THE WITNESS: In Little Rock.

THE COURT: At what job?

THE WITNESS: I was overseeing dump trucks in jobs here in town, and Mr. Gunter had come from Detroit and was working here in town with me.

THE COURT: He was working with you?

THE WITNESS: Yes, sir.

THE COURT: Who was your employer?

THE WITNESS: Highway Dump Haulers.

THE COURT: Who?

THE WITNESS: Highway Dump Haulers here in Little Rock.

THE COURT: And who was your boss?

THE WITNESS: Charles Ward.

THE COURT: Was this man Gunter that you knew an employee of the same outfit?

THE WITNESS: Yes, sir.

THE COURT: For about a year?

THE WITNESS: Off and on for eight or nine months.

THE COURT: He drove trucks?

THE WITNESS: Yes, sir.

THE COURT: And what did you do?

THE WITNESS: I drove a truck and overseed the job.

THE COURT: Now when you made contact there with the people who bought the cars, where were you working?

THE WITNESS: At that time I was working with Joiner, Cranford, Burke on the east belt bypass.

THE COURT: In other words, Mr. Cranford and Mr. Burke were partners in the company that employed you?

THE WITNESS: Yes, sir.

THE COURT: You were working on the east belt in Little Rock?

THE WITNESS: Yes, sir.

THE COURT: Is Little Rock your home?

THE WITNESS: Sir?

THE COURT: Is Little Rock your home?

THE WITNESS: North Little Rock.

THE COURT: How long have you lived there?

THE WITNESS: Since 1962.

THE COURT: Are you a native of Arkansas?

THE WITNESS: Yes, sir.

THE COURT: When did you first meet this man Mr. Gunter?

THE WITNESS: 1975.

THE COURT: At the job?

THE WITNESS: Yes, sir.

THE COURT: And then when you were working there with Cranford, Burke, how did you get in touch with Mr. Gunter?

THE WITNESS: Mr. Gunter had returned to Detroit in '75 and we communicated by telephone.

THE COURT: By telephone?

THE WITNESS: Yes, sir. Probably two times a year inquiring about jobs and so forth.

THE COURT: He knew where you were working?

THE WITNESS: Well, he—yes, sir.

THE COURT: Did he call you at home or at the job?

THE WITNESS: He called me at home.

THE COURT: And so how did it come about that you made these arrangements with Mr. Burke and Mr. Cranford? What was the first contact you had with Mr. Gunter about these cars?

THE WITNESS: Repeat that, sir.

THE COURT: What was the first contact you had with this Mr. Gunter about these cars?

THE WITNESS: He had called me and we were talking about the job and he mentioned that he had a car he needed to sell and I was having coffee with Mr. Burke and mentioned it and he said he was interested in it. So, I called Mr. Gunter back and we agreed to meet and purchase the car.

THE COURT: Then he brought that car down and you met him at Protho Junction?

THE WITNESS: Yes, sir.

[Defense Counsel]: Well, Your Honor, I don't want to interrupt the Court but the Court's question was he brought that car down.

THE COURT: Yes. I want to modify that. This Mr. Gunter that you said you are having trouble identifying, he was the one that had the car at Protho Junction?

THE WITNESS: Yes, sir.

THE COURT: Did he follow you over to Cabot?

THE WITNESS: Sir?

THE COURT: Did he follow you over to Cabot?

THE WITNESS: Yes, sir.

THE COURT: What were you in?

THE WITNESS: My pickup.

THE COURT: When that transaction was over he just left?

THE WITNESS: I carried him back to Little Rock and carried him over in the west part of town. I don't know the address, sir. Somewhere over around Central High School.

THE COURT: Do you know anything about his return to Detroit?

THE WITNESS: I don't have no idea, sir.

THE COURT: Then what's the next contact you had with him?

THE WITNESS: A few days later Mr. Cranford mentioned to me if I could get him one of those deals at the same price, he would be interested in it. I told him I didn't know whether this was possible or not. I didn't know. I called Mr. Gunter—

THE COURT: You called Mr. Gunter? You had his number in Detroit?

THE WITNESS: Yes, sir. And a few days later he called me back and said he had found a friend who was about to lose one behind on payments and was willing to sell it to someone that would just pay off what he owed on it, sir.

THE COURT: You may continue, [Assistant U.S. Attorney].