UNITED STATES of America,
Plaintiff-Appellee,

v.

Luther Lee LANHAM, Defendant-
Appellant.

No. 27270

Summary Calendar.

United States Court of Appeals
Fifth Circuit.

Sept. 5, 1969.

Kelly Dan Williams, court appointed, Houston, Tex., for appellant.

Anthony J. P. Farris, U. S. Atty., James R. Gough, George R. Pain, Theo W. Pinson, III, Asst. U. S. Attys., Houston, Tex., for appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

■ Pursuant to new Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the Clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir. 1969, 409 F. 2d 804, Part I.

■ The sole issue presented on this appeal is whether the trial judge improperly injected himself into the trial below as a prosecutor in such manner and to such extent as to deny the appellant a fair and impartial trial. We agree with the appellant that this is what occurred and reverse for a new trial.

Lanham was indicted and convicted for violation of the National Motor Vehicle Theft Act, sometimes called the Dyer Act, Title 18, U.S.C., Section 2312. He received a five year confinement sentence and is presently serving his sentence.

Lanham was charged and tried jointly with a co-defendant, David James Larson, for the transportation interstate of a stolen 1965 red Volkswagen from New Orleans, Louisiana, to Houston, Texas. The Volkswagen disappeared from the French Quarter in New Orleans without the owner's permission and was found on a parking lot on the campus of Rice University, Houston. A white 1964 Volkswagen disappeared without permission

from the parking lot about the same time. The defendants were found in possession of the white Volkswagen in Terrell County, Texas, and arrested. The government's case rested substantially on these circumstances and upon incriminating statements made by both Larson and Lanham to state and federal investigative agents.

When it came time for the defendants' case the first witness was Larson. He gave his age as 18 and related that he and Lanham hitchhiked to Houston with a Mr. Wilson in a black Ford, and that they were also hitchhikers in the white Volkswagen. By actual count in the transcript, his counsel asked him 36 questions and the prosecuting attorney then asked 55 questions in cross-examination. The presiding judge then took over Larson for a searching, probing examination that required 119 questions. We quote some excerpts in the margin.[1]

Lanham took the stand in his own defense at the conclusion of Larson's testimony. He admitted two prior felony convictions. He substantially corroborated Larson and told of their hitchhiking from New Orleans to Houston, where they were picked up by the driver of the white Volkswagen near the Astrodome. Following the government's cross-examination, the trial judge again embarked upon rigorous examination on his own.[2]

1. "Q. (By the Court) Well, then, can you explain to the Court and the jury why you made this statement to the F.B.I.? If you did not know anything about state charges, what motivated you to give this, what you now say, is a false statement, to the F.B.I. agent? What was your motivation? What caused you to do that?
A. (By Mr. Larson) Because Mr. Lanham has been convicted before and—
Q. Were you trying to help Mr. Lanham?
A. Yes, sir, I was.
Q. Who made up the story that you gave the F.B.I.? if it is a made-up story?
A. I don't know who made up the story.
Q. Well, now let's get down to some understandable facts.
The F.B.I. came out to see you and the first time, you wouldn't talk to the F.B.I. agent. Is that a fact?"
A few questions later the trial judge's examination proceeded:
"Q. (By the Court) Now, we're going to get at the truth, Mr. Larson. I am going to tell you that. Whatever the truth is, we're going to get at it, so you might as well make up your mind to that.
Now, you have told two or three different stories now just in the last two or three minutes. Now, let's just get to the truth. Let's get actually, factually, what happened out there when the F.B.I. came to talk to you."
The trial judge then started improperly to impeach the witness by inquiring into prior arrests:
"Q. (By the Court) That is the first time you had ever been arrested?
A. No.

Q. When had you been arrested before? Forget being arrested. I'm not interested in that.
But you then were taken to the Rehabilitation center?"
Moments later, the examination took a more argumentative trend:
Q. (By the Court) Do you know how you got off from that highway, from the Beaumont Highway to the Astrodome?
A. (By Mr. Larson) We hitchhiked out there. Do you mean do I know the direction?
Q. What? Where did he let you off?
A. He let us off down below the Astrodome, past it.
Q. Mr. Larson, I hate to tell you, that is just not possible.
A. It's not?
Q. No, sir, it is just not possible. The highway from Beaumont dumps you right down here, just right in the middle of downtown. There is no freeway running from downtown to the Astrodome."

2. Parts of this examination are quoted for illustration:
"Q. (By the Court) I mean, insofar as you are concerned, it is not the truth?
A. Well, let's put it this way. The truth is. I give the information, but I did not steal the car. I give the information to the Federal Bureau of Investigation.
Q. But the information you gave the F.B.I. came from another inmate?
A. The information I was given seems to be true, but not of David Larson or myself.
Q. That's what I'm talking about.
A. That's what I mean.
Q. But as to you and David Larson the information you gave the F.B.I. is not the truth?

Again, the statistical count of questions is significant. This time the count stood: defense counsel: 23 questions; government counsel: 17 questions; and the trial judge: 66 questions. The two defendants were the only witnesses for the defense.

In rebuttal, after recalling Sheriff Cooksey of Terrell County for a few questions, the prosecution recalled its principal F.B.I. witness, Special Agent Ivey. The court's examination of this witness was extensive. It had largely to do with the warnings given Larson and Lanham before taking statements from them and as to whether promises had been made with respect to possible state charges involving the white Volkswagen. The leading nature of a number of these questions is illustrated by the following:

"Q. (By the Court) And it is your unequivocal testimony, then, that you did not indicate to either one of them or both of them that you would do anything with reference to any charges that the state might have?

A. That's right.
Q. You got that story from another inmate?
A. Yes, I did.
Q. Do you know where that inmate is?
A. Yes, I do, Your Honor.
Q. Is he available to testify?
A. He will not testify.
Q. Well, if the Court sends for him and has him come into Court, he will have to testify.
A. Well, that remains to be between the Court and him.
Q. Well, now, are you willing to now give the Court his name?"
    *       *       *       *       *
"Q. (By the Court) All right. Now, Mr. Lanham, you understand—you know what your rights are, do you not?
A. At this moment, yes, sir.
Q. Didn't you know before you ever talked to the F.B.I.? You had been in trouble before.
A. Yes, I have."
    *       *       *       *       *
"Q. (By the Court) You knew that if you made any statement at all, that that statement could be used against you in Court?
A. No, sir.
Q. You didn't know that?
A. My understanding, it had to be a written statement.

A. That is correct, sir."
The government counsel announced closed. But that was not the end of the testimony before the jury. A recess was taken while a *court* witness, Louis Teal, was brought into the courtroom. He was in custody as an inmate, along with Lanham, of the Harris County Rehabilitation Center. The trial judge proceeded to examine Teal, after taking precautions that his testimony would not be transcribed except upon court order for a court-approved purpose. Teal's testimony impeached Lanham, who had testified that one statement he had given to Special Agent Ivey was based upon information told him by a tall, red-haired young man. Teal identified Lanham as a fellow inmate, one he had talked to, but denied telling Lanham what Lanham had ascribed to him about the interstate nature of his own auto theft charges. We quote portions of this unusual procedure in the margin.[3] Neither counsel took advantage of the court's offer to permit them

Q. Well, did you take the trouble to read this waiver of rights form?
A. No, sir, I never read it because when Mr. Ivey handed it to me I asked him what it was, and he said it was a form to waive a lawyer. So I figure he's not going to lie on me because he doesn't know. I never said nothing. So he could not use that against me for no reason.
Q. So you just signed it?"

3. "Q. Do you know Luther Lee Lanham?
A. Well, I have seen him. I don't know him personally.
Q. Have you ever talked to him?
A. Yes, sir.
Q. All right, sir. How long have you been at the Harris County Rehabilitation Center?
A. Three months and sixteen days."
    *       *       *       *       *
Q. All right, sir. Now, what have you discussed with Mr. Lanham?
A. Oh, we just talking. He just told me what he was in there for and stuff like that.
Q. He told you what he was in the Rehabilitation Center for?
A. Yes, sir.
Q. All right, sir. Did you give him any information about any charges that you might be in the Center for?

to examine the witness and both sides again announced closed.

It seems clear that the trial judge determined in his own mind that Lanham was giving perjured testimony and set out to demonstrate this to the jury.

A. No, sir.

Q. Insofar, as you know, does Mr. Lanham know what you are charged with?

A. Yes, sir, I think he does. I'm pretty sure he does.

Q. Did you tell him?

A. Yes, sir.

Q. Well, then, you have discussed with him what you are charged with?

A. No, sir, I didn't discuss it with him. I just told him what I was charged with.

Q. What are you charged with?

A. Well, two auto thefts and assault to murder.

Q. Are you charged with any transportation across state lines of a stolen automobile?

A. No, sir.

Q. So you are not under any charges of the Federal Government?

A. No, sir.

Q. Whatever it is that you are charged with, it relates to an automobile transported or alleged to have been stolen within the State of Texas?

A. Yes, sir. It was stolen in the City of Houston."

\*     \*     \*     \*     \*

"Q. All right, sir. Will you tell us what kind of car it is?

A. It was a Ford.

Q. A Ford?

A. Yes, sir.

Q. All right, sir. And you discussed this, your charge, with Mr. Lanham?

A. No, sir. I just told him—

Q. You told him—

A. I told him I was charged with stealing a Ford, a car, and that's all.

Q. You told him you were charged with stealing a Ford car?

A. Yes, sir.

All right, sir. Let me ask you this: Are you about six feet one inches tall? Are you six feet tall?

A. Yes, sir. I'm about five eleven and a half, maybe.

Q. Well, that's almost six feet.

A. Yes, sir.

Q. All right. You have red hair?

A. Yes, sir.

Q. Fair complexion?

A. Yes, sir.

In a word, he took over prosecution. This we may not permit.

■ The court-appointed counsel for the defendants, for some reason, failed to object.[4] We consider this unimportant. "Plain error", Rule 52(a), F.R.

Q. Are you about eighteen years old?

A. Yes, sir, I just turned eighteen.

Q. You weigh around a hundred and seventy pounds?

A. A hundred and sixty-five.

Q. A hundred and sixty-five. You live on the third floor of the Rehabilitation Center?

A. Yes, sir.

Q. Do you go to school in the mornings only?

A. Mornings and evenings.

Q. But that is at night?

A. Yes, sir.

Q. You do go to school in the mornings?

A. Yes, sir.

Q. All right, sir. Did you tell Mr. Lanham that if you came up here, if I called you here to testify, that you would play dumb?

A. No, sir.

Q. Do you have any idea why I called you up here?

A. No, sir, not the slightest idea.

Q. What is it that you understood that Mr. Lanham was charged with?

A. He told me he stole a Volkswagen in some state. I don't know what it was. And he said the reason he stole the Volkswagen was because that's all the money he had for the gas to come down here. He said he got down here and he stole another Volkswagen and he parked the other one somewhere. And he said the policeman stopped him in that one there. And I asked him why he stole the Volkswagen for—

Q. Well, don't tell me what he said. Is that what Mr. Lanham told you?

A. Yes, sir.

Q. Did he just tell you that you might be called to testify in court?

A. No, sir.

Q. When was the last time you talked to Mr. Lanham?

A. About a month ago."

4. Defense counsel did, prior to the case going to the jury, move in the alternative for a "new trial", or for an instruction that Teal's testimony as to Lanham's inculpatory admissions be disregarded by the jury. This motion was denied.

Crim.P., was committed, and in the language of that rule we notice it although it was not brought to the attention of the trial court. The impartial trial atmosphere, the "cold neutrality of an impartial judge", the defendant Lanham's credibility, his presumption of innocence, and any chance whether guilty or innocent, that he had of a successful defense, all were demolished, along with his Fifth Amendment right not to be deprived of his liberty without due process of law.

Of course, this Circuit has consistently followed the universal [5] condemnation of such excursions by judges outside the scope of their classic trial function. We note several of our own earlier cases simply to illustrate and underscore the principle involved and to attest to its undiminished vitality.

In Gomila v. United States, 5 Cir. 1944, 146 F.2d 372, we said:

> "A fair and impartial trial is guaranteed to every defendant, and fundamentally means a trial before an impartial judge and by an impartial jury. In aid of truth and in furtherance of justice, the court may question a witness,—in fact, he may call and question a witness not used by either party,—but in so doing the court should be careful to preserve an attitude of impartiality and guard against giving the jury any impression that the court was of the opinion that defendant was guilty. The opinion of the judge, on account of his position and the respect and confidence reposed in him and in his learning and assumed impartiality, is likely to have great weight with the jury, and such fact of necessity requires impartial conduct on his part."

Earlier we had held in Hunter v. United States, 5 Cir. 1932, 62 F.2d 217:

> "While that method of cross-examination, if it had been conducted by the district attorney, might have been proper, a district judge ought never to assume the role of a prosecuting attorney and lend the weight of his great influence to the side of the government. It is the judge's duty to maintain an attitude of unswerving impartiality between the government and the accused, and he ought never in any questions he asks go beyond the point of seeing to it, in the interests of justice, that the case is fairly tried."

We close with an extended quotation from an expression of this Court nearly 60 years ago:

> "The trial judge, under the federal system, is not only permitted, but it is his duty, to participate directly in the trial, and to facilitate its orderly progress and clear the path of petty obstructions. It is his duty to shorten unimportant preliminaries, and to discourage dilatory tactics of counsel. The purpose of the trial is to arrive at the truth, and without unnecessary waste of time. In performing his duties, it may become necessary to shorten the examination of witnesses by counsel, and there is no reason why the judge should not propound questions to witnesses when it becomes essential to the development of the facts of the case. This is a matter within the discretion of the court, with which we would be reluctant to interfere. But the conduct of the judge, in the performance of all his duties, should appear to be impartial. The impartiality of the judge—his avoidance of the appearance of becoming the advocate of either one side or the other of the pending controversy which is required by the conflict of the evidence to be finally submitted to the jury— is a fundamental and essential rule of especial importance in criminal cases. The importance and power of his office, and the theory and rule requiring impartial conduct on his part, make his slightest action of great weight with the jury. While we are of

---

5. See generally 23 C.J.S. Criminal Law § 987, p. 996; Bollenbach v. United States, 1946, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354; Starr v. United States, 1894, 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L.Ed. 841; United States v. Link, 3 Cir. 1953, 202 F.2d 592.

opinion that the judge is permitted to take part impartially in the examination or cross-examination of witnesses, we can readily see that, if he takes upon himself the burden of the cross-examination of defendant's witnesses, when the government is represented by competent attorneys, and conducts the examination in a manner hostile to the defendant and the witnesses, the impression would probably be produced in the minds of the jury that the judge was of the fixed opinion that the defendant was guilty and should be convicted. This would not be fair to the defendant, for he is entitled to the benefit of the presumption of innocence by both judge and jury till his guilt is proved. If the jury is inadvertently led to believe that the judge does not regard that presumption, they may also disregard it.

"A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge. Besides, the defendant's counsel is placed at a disadvantage, as they might hesitate to make objections and reserve exceptions to the judge's examination, because, if they make objections, unlike the effect of their objections to questions by opposing counsel, it will appear to the jury that there is direct conflict between them and the court. If it were the function of the judge in this country as it is in some foreign tribunals, to perform the duties incumbent here on the district attorney, the impression produced on the minds of the jury against the defendant would not be so inevitable. Counsel are expected to maintain an attitude of respect and deference toward the judge, and this attitude is maintained without difficulty when the judge confines his activities to the usual judicial duties. And the judge can more easily treat counsel with the respect due an officer of the court in the preformance of a duty, if he avoids the performance of the duties incumbent properly upon an attorney representing one side of the case. The evidence taken as a whole, might be so conclusive of the defendant's guilt that an appellate court would not be justified in interfering with the judgment on this account alone. But in a case where there is substantial conflict in the evidence as to the essential points that were required to be submitted to the jury, the course of the judge in unnecessarily assuming to perform the duties incumbent primarily upon others might make it the duty of an appellate court, *on this ground alone,* to grant a new trial." (Emphasis added)

Adler v. United States, 5 Cir. 1910, 182 F. 464.

In order that a new trial, free from prejudicial error, may be accorded the appellant, the judgment is

Reversed.