**Concurring opinion issued August 6, 2012**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00082-CR
_____

**CHRISTOPHER RIOS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from County Criminal Court at Law No. 14**
**Harris County, Texas**
**Trial Court Case No. 1547542**

---

## CONCURRING OPINION

As there is little about this case that cannot be but very disturbing to people of good will seeking justice, I write separately to express my visceral revulsion.

When the State and defense came to the table to negotiate, the State claimed to have three cards in its hand: a video and the results of two intoxilyzer samples,

both nearly double the legal limits—strong stuff. Based upon the State's representations, the defense folded and entered a plea agreement. Later it learned that two of those three cards were not what they were represented to be.

If our jurisprudence is to regard a plea agreement as a contract between the defendant and State, there cannot be permitted even the slightest measure of fraudulent inducement to that contract. Here, an agent of the State falsified intoxilyzer records. Rios's guilty plea was induced by dealing Rios a tainted hand. Sadly, by the time this shameful little secret came to light, the State and Rios had long since negotiated a plea deal based upon the "cooked" results.[1] When Rios was advised that an operative of the state prosecutorial apparatus had falsely certified the results and the assistant district attorney prosecuting this case conceded "the intoxilyzer test was invalid . . . The state cannot verify the validity of the test," he sought to challenge his conviction.

Plea agreements on misdemeanor driving-while-intoxicated cases are concerned with two fundamental pieces of evidence: the video from the law enforcement officer's dashboard camera and the results from the intoxilyzer, a piece of equipment that quantifies one's blood alcohol content (BAC). The dash

---

[1] I take judicial notice that more than 1200 other cases were set aside as a result of these intoxilyzer falsifications. *See* Brian Rogers, *Fake Intoxilyzer Tests Invalidate Stacks of DWIs*, HOUS. CHRON., Oct. 9, 2009, http://www.chron.com/default/article/Fake-Intoxilyzer-tests-invalidate-stacks-of-1722652.php.

cam video of Rios's performance of the sobriety exercises depicts Rios as perfectly steady, cooperative, and polite (albeit, given the hour, tired).[2] Despite the officer's varying (and conflicting) directives to Rios with respect to some of the field-sobriety exercises, most notably the walk-and-turn exercise, the video reveals only two *possible* departures from a near-perfect execution of the exercises by Rios. On the walk-and-turn exercise, Rios took a single additional half-step more than one of the varying versions of the officer's directives instructed him to take[3]; and on the follow-the-piercing-light-in-your-eye-at-night-without-moving-your-head exercise, only when the officer had his light at the very farthest extremes of the span of the officer's arm's length, did Rios make a nearly imperceptible turn of

---

[2]  The majority correctly notes the poor quality of the video. I, however, strongly disagree with the majority's assertion that "[r]easonable people, after viewing the video, could come to different conclusions concerning its significance." The tape is generally difficult to hear, as there is a loud, heavy buzz that runs throughout the tape, and the sound often cuts out for minutes at a time. But that which can be heard and seen serves to exculpate Rios.

[3]  On the walk-and-turn test, the audio is particularly bad, at one point cutting out for almost ninety seconds. Moreover, from that which is audible, the officer described how to make the turn in *four completely different ways* over the course of about three minutes, alternatively describing it as:
- "using your right foot . . . just take a series of small steps"
- "kinda like" an about-face
- "keep[ing] your left foot planted, and just turn[ing] like this. See how I'm pivoting?" (while *moving his left foot* and taking three small steps to make the turn)
- "turn around using two small steps"

[4]  After which Rios followed the penlight for over a full minute without moving his head.

his head.[4]  To require any more of these "exercises" would demand precision more akin to fighter pilots and Olympic gymnasts than typical citizens at all hours of the day or night.

Even with such an innocuous video, and notwithstanding the State's burden of proof, a defendant is still faced with a steep, well-nigh insurmountable hurdle when the intoxilyzer results are markedly higher than the permissible .08% blood alcohol level.  Scientific measurement, after all, is usually pretty compelling and not easily refuted.  Thus, as the intoxilyzer numbers rise, so do the prospects of a plea bargain, and the likelihood the defense will desire to take the case to trial falls.

Despite the fact that the State, at the time of the original plea, was unaware of the falsification of the intoxilyzer results, regardless of the good faith or bad faith of the prosecution, the responsibility for the validity of the evidence used to extract a guilty plea in a plea-bargain case rests with the prosecutorial arm of the State.  As Justice Kennedy reasoned in *Kyles*:

> [N]o one doubts that police investigators sometimes fail to inform a prosecutor of all they know.  But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972).  Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the

prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568 (1995). It is axiomatic that the Due Process Clause of the Fourteenth Amendment is violated when the State knowingly or unknowingly uses perjured testimony to obtain a conviction. *Ex Parte Robbins*, 360 S.W.3d 446, 476 (Tex. Crim. App. 2011) (Alcala, J., dissenting) (citing *Ex parte Chabot*, 300 S.W.3d 768, 770–71 (Tex. Crim. App. 2009); *Ex parte Napper*, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 2374 (2011)).

However, when Rios pursued legal relief from the State's duplicity (unwitting/hapless/unintentional though it may have been) via a writ of habeas corpus, he was confronted at the hearing not by an adversarial prosecutor (who stood as silent as Rios's own counsel),[5] but a judge who usurped the role of the prosecutor and proceeded to grill Rios with leading questions interlaced with accusations. Indeed, the judge treated the habeas hearing as if it were for a motion to revoke the very probation the court had previously granted in exchange for Rios's guilty plea based on falsified evidence.

---

[5] Reciting no grounds therefore, Rios's attorney made but one global objection to the Court's examination of Rios (on which the court's "ruling" was: "I appreciate your objection," before immediately repeating the very question that had drawn the objection) and made no further effort to guide, direct, or otherwise protect his client.

In light of the State's concession during the habeas hearing ("I cannot vouch for the video"), the record as it comes to us strongly suggests that this Court was the first to have viewed the video which, important to note, was never introduced into evidence nor viewed by the trial court prior to the judge's denial of habeas-relief at the hearing. Indeed, by its refusal to "vouch" for it, the State effectively disavowed it.

First, there is the original defense attorney who either advised or permitted his client to plead guilty despite a most exculpatory dash-cam video. Nothing in the record indicates that the attorney responsible for the protection of Rios's legal interests viewed the officer's dashboard video of the stop and Rios's near-flawless performance on the field-sobriety exercises. Indeed, had it been viewed, the video would have sounded the alarm that the high numbers of the intoxilyzer results were suspect.

Then, there is the subsequent defense attorney who, as is evident from the transcript of the hearing on the habeas writ, came to court with sparse evidence, put on his defendant witness almost as an afterthought, was insufficiently familiar with charging instruments to have recognized the information by which his client had been charged, and allowed the judge to verbally spar with a wholly unprepared and nervous young defendant.

What is perhaps most disturbing, however, is the demeanor of the trial judge— an "arbiter[] of the government's obligation to ensure fair trials"—at the habeas hearing. *See Kyles*, 514 U.S. at 438, 115 S. Ct. at 1568. At the habeas hearing, having stipulated the breathalyzer results were inadmissible, the assistant district attorney neither opposed the requested habeas relief *nor asked a single question*. The judge, however, subjected Rio to a blistering twenty-two questions,[6] inquiring as to a number of relevant, as well as irrelevant, issues, including whether Rios remembered taking the breathalyzer test and what type of drink Rios may have been drinking on the night he was arrested. At one point during the hearing, Rios, who is speaking haltingly, and clearly struggling to grasp the judge's questions, begins to answer the question posed to him, only to have the judge, who felt as if he had been interrupted, threaten him with contempt.[7]

The record contains additional indications that, rather than acting an impartial arbiter, the judge was effectively acting as part of the prosecutorial arm

---

[6] While a trial judge has the right to ask a defendant questions, "the law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial." *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (plurality op.). Moreover, a trial judge should not usurp the role of prosecutor by asking leading questions or far more questions than the prosecutor and defense ask put together. *See United States v. Lanham*, 416 F.2d 1140, 1145 (5th Cir. 1969). Here the judge's aggressive, leading, and bullying questionings breached both these standards.

[7] There is also an entire line of the judge's inquiry that, curiously, is preoccupied with the absence of any recitation of intoxilyzer test results in the plea papers . . . as though the particular evidence with which the State induces a defendant to plea has some place in plea papers.

7

of the State during the hearing. Specifically, very early-on in the hearing, and, tellingly, prior to any examination or discussion of evidence except for the bare-bones stipulation of evidence,[8] the judge, not the prosecutor, repeatedly made reference to the "appellate record," foreshadowing a need for same from his own, not-as-yet pronounced decision in this case. Indeed, it was the judge himself, not the prosecutor, who had the preprinted plea forms of his court "marked . . . for Appellate purposes as Court's Exhibit . . . 1, that will go up with the Appellate Record."

Inexplicably, the trial judge later found that a reasonable jury could have convicted Rios based on the videotape of his stop—a video that the State not only never introduced into evidence but affirmatively disavowed ("I cannot vouch for the video"). The trial judge's findings are not supported by the video, or any other evidence in the record.

---

[8] The stipulation of evidence recites what one might fairly characterize as an agreement in anticipation of dismissal: "Defendant . . . and the State, have entered into this stipulation of the evidence *serving as the basis of the vacating of judgment and subsequent dismissal of the subject charge against the Defendant.*" [Emphasis added.]

I concur with this Court's judgment.


Jim Sharp
Justice


Panel consists of Chief Justice Radack and Justices Sharp and Brown.

Publish.  TEX. R. APP. P. 47.2(b).