# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00278-CR

**Michael Rene VanWinkle, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 74088, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Michael Rene VanWinkle was charged with aggravated sexual assault for allegedly causing "the penetration of the mouth of" his niece, C.M., who was younger than fourteen at the time of the offense. *See* Tex. Penal Code § 22.021(a)(1)(B)(ii), (2)(B) (providing that person commits offense if he "intentionally or knowingly . . . causes the penetration of the mouth of a child by the sexual organ of the actor" and if the victim is younger than fourteen years of age), (e) (explaining that offense is first-degree felony). Prior to entering a plea, VanWinkle signed a voluntary statement that he gave to the police in which he admitted that he had oral sex with C.M. multiple times and further explained that his penis was placed inside C.M.'s mouth during these encounters. Later, VanWinkle entered a plea of guilty to the charged offense and asked the district court to assess his punishment. In addition, VanWinkle signed a judicial confession in which he admitted that he "committed each and every act alleged" in the indictment. During the punishment hearing,

VanWinkle testified, and the district court asked several questions regarding his testimony. At the end of the proceeding, the district court imposed a punishment of 50 years' imprisonment. *See id.* § 12.32 (setting out permissible punishment range for first-degree felony). On appeal, VanWinkle contends that the district court "committed fundamental error because [it] abandoned the role of a neutral, detached hearing officer and took on the role of an advocate for the State" when it elected to question him and the victim. We will affirm the district court's judgment of conviction.

**GOVERNING LAW**

The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due Process guarantees that a criminal defendant has the right to a hearing before a detached and neutral judge. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *see also Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (explaining that due process minimally "requires a 'fair trial in a fair tribunal'" (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975))); *Villareal v. State*, 348 S.W.3d 365, 372 (Tex. App.—Austin 2011, pet. ref'd) (same). That right extends to both the guilt or innocense phase as well as the punishment phase. *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi 2008, no pet.).

"A trial court is permitted to question a witness when seeking information to clarify a point, or to get the witness to repeat something that the judge could not hear." *Williams v. State*, 89 S.W.3d 325, 328 (Tex. App.—Texarkana 2002, pet. ref'd). However, there are two potential dangers that can arise if a trial court exceeds the bounds of this permissible type of questioning: "(1) the trial court may convey its opinion of the case to the jury and ultimately influence the jury's

2

decision," and "(2) the trial court in its zeal and active participation may become an advocate (in the adversarial process) and lose the neutral and detached role required for a judge." *Id.* The first potential danger does not apply to bench trials because questioning does not occur in the presence of a jury. *See id.* When deciding whether the second potential danger is present, reviewing courts should bear in mind whether the defendant pleaded guilty to the offense. *See Guin v. State*, 209 S.W.3d 682, 686 (Tex. App.—Texarkana 2006, no pet.). If a defendant pleads guilty, "the [trial] court does have a role in addressing the defendant" in order "to admonish the defendant on a number of matters." *Id.*; *see* Tex. Code Crim. Proc. art. 26.13(a) (containing list of admonishments that trial court must give defendant who is pleading guilty or nolo contendere). In addition, "[t]he court is also required to make an independent determination as to whether the defendant's plea of guilty is freely and voluntarily given and whether the defendant is mentally competent to enter such a plea." *Guin*, 209 S.W.3d at 686. Moreover, as occurred in this case, if a defendant filed an application for community supervision, trial courts have "the responsibility for determining when the imposition of sentence in certain cases shall be suspended, the conditions of community supervision, and the supervision of the defendant." *Id.*; *see* Tex. Code Crim. Proc. art. 42.12, § 1 (explaining that trial courts have responsibility for determining whether to impose community supervision). Specifically, a trial court may place a defendant on community supervision if the court determines that it is "in the best interest of justice, the public, and the defendant." *See* Tex. Code Crim. Proc. art. 42.12, § 3(a).[1] "In making the determinations that are required when a defendant is seeking community

_____

[1] In general, the Code of Criminal Procedure provides that the article authorizing a trial court to impose community supervision does not apply "to a defendant adjudged guilty of" certain offenses including aggravated sexual assault. *See* Tex. Code Crim. Proc. art. 42.12, § 3g. However, the Code

3

supervision," trial courts have "the authority to independently inquire from witnesses information relevant to those determinations." *Guinn*, 209 S.W.3d at 686; *see* Tex. Code Crim. Proc. art. 42.12, § 11(a) (allowing trial court to impose conditions of supervision designed to restore or protect community and victim or to "punish, rehabilitate, or reform the defendant").

Moreover, if a defendant does not object to "'remarks and conduct of the [trial] court,'" he may not subsequently challenge the trial court's remarks "'unless they are fundamentally erroneous.'" *Wilson v. State*, 473 S.W.3d 889, 903 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quoting *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.)); *see* Tex. R. App. P. 33.1(a) (stating that to preserve error for appeal, record must show that complaint was made to trial court and that trial court ruled on request or refused to rule and that "complaining party objected to the refusal"). In other words, the defendant may only challenge the alleged errors if they are "so harmful that the defendant was denied a fair and impartial trial." *Moreno*, 900 S.W.2d at 359. "Absent a clear showing of bias," however, "a trial court's actions will be presumed to have been correct." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006).

---

also provides that if, as in this case, a defendant enters "a plea of guilty or plea of nolo contendere," the trial court may "defer further proceedings without entering an adjudication of guilt, and place the defendant on community supervision" if the court determines it is in the best interest of society and the defendant. *Id.* § 5(a). That provision applies to defendants charged with, among other crimes, aggravated sexual assault "regardless of the age of the victim." *Id.* Although there are additional limitations regarding the availability of community supervision for someone who has been convicted of aggravated sexual assault, those limitations are not at issue in this case. *See id.* art. 42.12, § 5(d)(2)-(3) (providing that trial court may not grant deferred adjudication if, among other reasons, defendant was charged with aggravated sexual assault and "has previously been placed on community supervision" or is charged with aggravated sexual assault and has previously been convicted of certain felony offenses or is eligible for enhanced punishment under section 21.021 of Penal Code because victim is younger than six years old or because of manner in which felony was committed).

4

**DISCUSSION**

In his sole issue on appeal, VanWinkle asserts that his due-process rights were violated when the district court questioned him and C.M. about the charged offense and other allegations.[2] Although VanWinkle acknowledges that he made no objection to any of the questions posed by the district court, he asserts that the district court committed fundamental error by asking the questions that it did because the court "became involved as an advocate [for the State] to such an extent that [it] could not impartially assess punishment," that the trial court's involvement was "tantamount to efforts to bolster the State's case after the State's fairly concise cross-examination" and "to advocate the falsity of VanWinkle's testimony," and that the trial court's bias is evidenced by the fact that the district court sentenced him to 50 years' imprisonment even though the presentence-investigation report prepared in this case concluded that it was unlikely that he would re-offend or be a danger to the community.

During the punishment phase, C.M. testified that VanWinkle sexually assaulted her on numerous occasions over a period of time lasting several years and that the assaults first started when he spanked her while she did not have any clothes on. After the parties finished questioning C.M., the district court asked C.M. about where she went to school, how often the assaults occurred, when they stopped occurring, whether she understood what was happening was wrong, whether the other children in the home were spanked in the same manner that she had been, whether her mother knew that VanWinkle was spanking her, how the frequency of the assaults changed as she got older,

_____

[2] We note that the district court questioned all of the witnesses who testified during the punishment hearing, but VanWinkle limits his challenge to the questions posed to C.M. and himself.

5

whether she mentioned to her friends or her siblings what VanWinkle had been doing, whether she had been in counseling, whether the counseling had been helpful, where she and her mother were planning to move after the trial, whether VanWinkle threatened her or told her not to tell anyone, where the offenses occurred, and where her family members were during those assaults.

In addition to calling C.M. to the stand, the State also called K.B. to testify. In her testimony, K.B. explained that she was VanWinkle's former stepdaughter and that when she was eleven years old, VanWinkle fondled her breasts, showed her "a box full of porn movies and said that [she] could watch one," and presented to her "a purple strap-on toy and told [her] how it's used."

After C.M. and K.B. testified, VanWinkle was called to the stand, and he stated that he was sorry for committing the offense that he pleaded guilty to, that he did not know why he did it, and that he would like to be placed on community supervision because it was his "first offense," and VanWinkle also repeatedly characterized his actions as "stupid." In his cross-examination, he testified that he only assaulted C.M. "[o]ne time." Later, he admitted that there may have been more occasions but that it was not until after C.M. turned fourteen, and he expressly denied having any sexual contact with C.M. before then. But VanWinkle changed his testimony once more and stated that "[i]t didn't happen [over] multiple years, it only happened that one time." After this exchange, the State said that it was finished questioning VanWinkle, and the district court elected to ask VanWinkle several questions. First, the district court asked numerous questions regarding VanWinkle's previous employment and about his family. Then the district court asked VanWinkle about the allegation that K.B. testified about during the hearing in which she asserted that VanWinkle fondled her breasts when she was eleven and later questioned VanWinkle about the allegations made by C.M. in her testimony. Those exchanges occurred as follows:

6

[District Court]: So Mr. VanWinkle, when you heard -- when you heard [K.B.] talk about this event that happened with her on one occasion, I'm not quite sure I understand. Are you saying that she is the one who asked you to touch her breasts?

[VanWinkle]: Yes, ma'am.

[District Court]: So she's invited you to do that?

[VanWinkle]: Yes, ma'am.

[District Court]: When she's 11 years old?

[VanWinkle]: Yes, ma'am.

[District Court]: And what did you do?

[VanWinkle]: It was the only time I ever bothered her.

[District Court]: And what did you do?

[VanWinkle]: Just touched and I left her alone.

[District Court]: Did you show her some sex device?

[VanWinkle]: That was in our closet.

[District Court]: Did you show it to her?

[VanWinkle]: No.

[District Court]: Did you talk with her about and asking her that if she had any questions about sex or anything that you would talk to with her about it?

[VanWinkle]: Yes, ma'am, I did. But like I said, she never did bother with it and I never bothered talking to her about it.

[District Court]: Why would you grope her breasts?

[VanWinkle]: I don't know, ma'am.

[District Court]: Well, think about it a moment, sir. You tell me why because I'm sure you must have a reason.

[VanWinkle]: I should have never done it.

[District Court]: You didn't do it?

[VanWinkle]: I never should have done it.

[District Court]: Should have not done is what you're saying?

[VanWinkle]: Yes.

[District Court]: Well, I think everybody here would probably agree with you there. But why did you do that?

[VanWinkle]: I don't know, ma'am.

[District Court]: That's stupid?

[VanWinkle]: Yes, very stupid.

[District Court]: And then how long after that was it that you started having oral sex with [C.M.]?

[VanWinkle]: That didn't happen until she was 14.

[District Court]: You heard her talk about from when she was age 10 on what began to happen when she was 10?

[VanWinkle]: Nothing. Like I said, I spanked her that one time and then after that I never touched her again.

[District Court]: Did you put ice on her bottom?

[VanWinkle]: No, ma'am.

[District Court]: So when you spanked her, did you have her take her clothes off?

[VanWinkle]: Yes.

[District Court]: Why?

[VanWinkle]: Because I spanked her bare bottom like I done my kids before.

8

[District Court]: You had them take their clothes off too?

[VanWinkle]: We've had them drop their drawers before.

[District Court]: Not "we," I'm talking about you.

[VanWinkle]: Me, I only spanked my kids a total of one time. All of them. My boys, my girls. My wife usually did that. Spank the kids.

[District Court]: Why --

[VanWinkle]: I would raise the voice.

[District Court]: Why with [C.M.] when you would spank her and have her take down her pants?

[VanWinkle]: I spanked her because she was grounded and she was watching TV and I caught her watching TV. So I gave her a spanking for watching the TV when she was supposed to be grounded.

[District Court]: How many more times did you do that?

[VanWinkle]: That was the only time.

[District Court]: So did you ever put ice on her bottom?

[VanWinkle]: No.

[District Court]: So she's not telling the truth about that?

[VanWinkle]: I never put ice on her bottom. She may have put it on her own self but I never did.

[District Court]: Did you invite her into your bedroom so that you could have oral sex with her?

[VanWinkle]: One time but I mean, once I did it, I knew I done wrong.

[District Court]: How many times did you do that in your bedroom?

[VanWinkle]: A couple of times.

9

[District Court]: How many times in her bedroom?

[VanWinkle]: None.

[District Court]: How many in other rooms?

[VanWinkle]: None.

[District Court]: When you write your statement here, and you put this in your statement that you did it numerous times, sometimes in your bedroom, and numerous times after that. Here, sir, you're here to tell the truth.

[VanWinkle]: I am telling the truth.

[District Court]: So let's talk about being real honest and with how many times did you do this with your stepdaughter?

[VanWinkle]: Who?

[District Court]: [C.M.]

[VanWinkle]: Just a couple of times like I said in there.

[District Court]: Read that again, sir.

[VanWinkle]: It says multiple times.

[District Court]: Yes. A couple and multiple have a different meaning. Couple might mean two or three. Multiple means many. I'm trying to get you to be honest with the Court, you pled guilty to this offense. I want you to be honest with the Court, these people out here, and the prosecutor and your lawyer. Sometimes you got to be honest about this.

[VanWinkle]: I am.

[District Court]: How many times did you do this? Can you count?

[VanWinkle]: A couple, three or four times.

[District Court]: A week?

[VanWinkle]: No.

10

[District Court]: A month?

[VanWinkle]: In a month, maybe but not every month.

[District Court]: Does it make a difference? You only do it a couple of times a month versus weekly?

[VanWinkle]: No, it don't make a difference.

[District Court]: What do you want this Court to do with you, sir?

[VanWinkle]: I would like to have probation so I can go out and try to fix everything I messed up.

[District Court]: What are you going to start with fixing, sir, if you don't start with yourself first?

[VanWinkle]: I will fix myself too.

[District Court]: How are you going to do that when you can't be honest with the Court?

[VanWinkle]: I am being honest. I will do what I have to do.

[District Court]: What have you done since you've been locked up?

[VanWinkle]: Nothing. I can't do nothing.

[District Court]: And why did you do this with these children because they are children?

[VanWinkle]: Stupid. I just, like I said, it was stupidity on my part.

[District Court]: Well, normally, sir, when people do something stupid and they realize that they do it once or twice, they usually understand that was stupid and don't do it again. Right?

[VanWinkle]: Yes, ma'am.

[District Court]: You did this more than once or twice. How do you account for being stupid multiple times?

11

[VanWinkle]: I can't, ma'am. I just know that I didn't -- I was –

[District Court]: You can't tell me that you didn't do it intentionally. You surely you're not telling me that.

[VanWinkle]: No, I'm not. That's why I said I should have never done it.

[District Court]: Well, that -- everybody would agree with that. The question is what to do with you. I've got to figure out what to do with you and I'm watching you, listening to you, trying to understand where you're coming from and what your honesty is and your credibility with the Court so I can figure out what is appropriate.

Do you understand when you take the stand, that's what I'm gauging when I'm sitting here asking questions of either of a defendant or a witness is I'm trying to figure out where you're headed, where you're coming from and what I need to do, not only for you but to protect society.

So that's why I'm asking you about this offense and I'm trying to figure out if you are going to be really honest with the Court about it.

[VanWinkle]: I did it multiple times, ma'am.

[District Court]: And how many times would you say is multiple?

[VanWinkle]: Three or four times.

[District Court]: Altogether?

[VanWinkle]: Yes.

[District Court]: Over a year, two years, three years?

[VanWinkle]: Yes.

[District Court]: Couple of times a year?

[VanWinkle]: Three or four times. Maybe.

[District Court]: And maybe not?

[VanWinkle]: Three or four times.

[District Court]: Altogether?

[VanWinkle]: Altogether.

[District Court]: From age 10 to 14?

[VanWinkle]: It didn't happen when she was ten, ma'am.

[District Court]: Or 11.

[VanWinkle]: No.  Or 12 or 13.

[District Court]: So what she's sat in here and said is not true?

[VanWinkle]: No, ma'am.  Only time it happened is when she was 14.

[District Court]: Why did it happen then?

[VanWinkle]: Because I was -- I don't know why, ma'am.  It was stupid.  And I like I said, I've never done anything like that.  I never ever thought about doing anything like that in my life.

[District Court]: Well, you obviously did when you were doing something similar with [K.B.] some years before, right?

[VanWinkle]: No, ma'am.  I told her if she ever wanted to talk about it, we could talk about it.  But, like I said, she had went out -- she went out on her own and I never did talk to her about it.

Although the extensive nature and the manner of the questioning posed by the district court does give this Court some pause, *see Long v. State*, No. 13-13-00579-CR, 2015 WL 234021, at *1, *5 (Tex. App.—Corpus Christi Jan. 15. 2015, pet. ref'd) (mem. op., not designated for publication) (concluding ultimately that defendant "has not demonstrated fundamental error" regarding questioning posed by trial court after defendant pleaded guilty but warning that "[t]he extent and adversarial nature of the trial judge's questioning of" defendant and his wife "in this

13

case is cause for unease"); *cf. Galvan v. State*, 988 S.W.2d 291, 297 (Tex. App.—Texarkana 1999, pet. ref'd) (explaining that "Texas is 'second to none' in its disapproval of judges' examination of witnesses during a jury trial"), we do note as an initial matter that much of the questioning done of VanWinkle was an attempt to clarify his prior inconsistent testimony regarding the number of times that he sexually assaulted C.M. and regarding when those offenses occurred as well as the nature of the misconduct that he engaged in with K.B. and that much of the length of the exchange is explained by the fact that VanWinkle continued to provide contradictory answers in response to the district court's questions. Similarly, much of the questioning posed to C.M. focused on clarifying when, where, and how often the assaults occurred. Accordingly, a large portion of the questions asked would seem to fall within the types of permissible questions that a trial court may pose to witnesses, and the district court did not ask any questions that the attorneys in this case would not have been allowed to. *See Long*, 2015 WL 234021, at *5 (explaining that when asking questions trial court "appeared to be seeking facts for [its] role as factfinder, the questions the [court] asked of [the defendant] and [his wife] would not have been out of bounds to the parties' attorneys, and the answers of both were within the bounds of admissible testimony").

In addition, as discussed previously, VanWinkle pleaded guilty to the alleged offense and asked the district court to place him on community supervision, and the questions posed by the district court to VanWinkle and to C.M., including what his employment history was like, what his relationship with his family was like, why he committed the acts at issue, how many times he assaulted C.M., how those acts affected C.M., and how he interacted with other children, seem directly relevant to a determination regarding whether placing VanWinkle on community supervision

14

was "in the best interest of justice, the public, and the defendant." *See* Tex. Code Crim. Proc. art. 42.12, § 3(a); *see also Long*, 2015 WL 234021, at *5 (noting when overruling issue alleging bias on part of trial court that court asked questions that were relevant to determination of whether defendant should be placed on community supervision and that trial court "had leeway to follow up on this issue after the parties' attorneys finished their examination, even though some of the questions went beyond what was necessary for the trial court to make a decision"). In fact, as set out above, the district court explained that it continued to ask questions in order to figure out what punishment was most appropriate and how "to protect society."[3]

---

[3] In his brief, VanWinkle contends that the fact that he requested community supervision should have no bearing in this case. As support for this proposition, VanWinkle refers to a previous opinion by this Court. *See Agee v. State*, No. 03-01-00338-CR, 2002 WL 219874 (Tex. App.—Austin Feb. 14, 2002, pet. ref'd) (not designated for publication). In *Agee*, like in this case, Agee pleaded guilty to the offense of aggravated sexual assault of a child, and there was no jury present during the punishment hearing. *Id.* at *1, *2. After both sides finished questioning the victim's mother, who was also Agee's wife, the trial court asked the victim's mother about "her attitude toward her husband, her efforts to obtain counseling for her daughter, and her plans for the future if appellant were to receive probation as she requested." *Id.* at *1. This Court determined that there was "no support in the record for [Agee]'s assertion that the court became an advocate for the State" because the questions were meant "to clarify statements the witness had previously made and to gather additional information relevant to punishment." *Id.* at *2.

When referring to *Agee*, VanWinkle contends that the questioning was proper in that case because the questioning was not posed to Agee but to his wife and pertained to prior testimony indicating that she might want to live with Agee if he were placed on community supervision. Accordingly, VanWinkle contends that the questioning in *Agee* was relevant to the issue of community supervision but that "[t]hose considerations are not relevant here because VanWinkle and his wife were divorced shortly after the allegations of abuse came to light." Moreover, VanWinkle urges that the questions posed by the district court were unnecessary because, unlike Agee, he testified and ultimately admitted that C.M.'s allegations regarding the frequency of the offenses were accurate.

We do not believe that *Agee* can be read as standing for the proposition that a trial court cannot question a defendant if he chooses to testify, *cf. Moreno v. State*, 944 S.W.2d 685, 689 (Tex. App.—Houston [14th Dist.] 1997) (noting that when defendant chooses to testify, "he is generally

Moreover, nothing in the record indicates that the district court became so involved as an advocate that it could no longer impartially assess punishment. *See Guin*, 209 S.W.3d at 686-87; *cf. Moreno*, 900 S.W.2d at 359-60 (determining that trial court's questions during guilt or innocence phase did not rise to level of fundamental error because court was seeking facts relevant to its role as factfinder, because questions would have been allowed by parties' attorneys, because answers were within range of admissible testimony, and because nothing in record showed that court "became so entangled" in role as advocate that it could not make objective fact finding). Although the district court, perhaps ill-advisedly, used the word "stupid" on more than one occasion when questioning VanWinkle, the context in which those comments were made reveal that the district court was referring to portions of VanWinkle's prior testimony in which he could not explain why he committed the offenses mentioned by C.M. and K.B. and in which he simply asserted that he behaved in a "stupid" manner. Similarly, although the district court repeatedly questioned whether VanWinkle was being honest with the court, those statements were made in response to the contradictory answers made by VanWinkle regarding the allegations against him and were made to encourage VanWinkle to admit to his misconduct so that the district court could properly assess what punishment to impose. For these reasons, VanWinkle has not shown that the district court's

---

subject to the same rules as any other witness"), *aff'd*, 22 S.W.3d 482, 489 (Tex. Crim. App. 1999), nor do we believe that *Agee* attempted to carve out the precise topics that may be asked about for the purposes of determining if community supervision is warranted. Moreover, as discussed previously, we believe that the questions posed by the district court in this case did bear upon a community-supervision determination. In addition, as shown above, although VanWinkle pleaded guilty to the charged offense, he provided inconsistent testimony regarding the other allegations made by C.M. regarding the frequency of the assault and continued to provide inconsistent testimony when questioned by the district court.

questioning was so egregious that it made the court biased and, therefore, has not demonstrated any fundamental error. *See Hernandez*, 268 S.W.3d at 184 (explaining that trial court's conduct only amounts to fundamental error if it is "so egregious as to deem the judge biased on the matter of punishment"); *see Agee v. State*, No. 03-01-00338-CR, 2002 WL 219874, at *2 (Tex. App.—Austin Feb. 14, 2002, pet. ref'd) (mem. op., not designated for publication) (determining that in bench trial in which trial court had to assess punishment, court did not commit fundamental error when it questioned witness on issues that were previously raised in her testimony and that were relevant to punishment).[4]

In light of the preceding, we overrule VanWinkle's issue on appeal.

## CONCLUSION

Having overruled VanWinkle's sole issue on appeal, we affirm the district court's judgment of conviction.

---

[4] When asserting that the district court's questioning constituted fundamental error, VanWinkle refers to *United States v. Lanham*, in which the appellate court ordered a new trial after determining that the trial court "took over prosecution," "determined in [its] own mind that Lanham was giving perjured testimony[,] and set out to demonstrate this to the jury" through questioning that was significantly more extensive than any questioning posed by the prosecution or the defense. 416 F.2d 1140, 1142, 1143 (5th Cir. 1969). We believe that VanWinkle's reliance on *Lanham* is misplaced. Unlike the case presently before us, *Lanham* was a jury trial, and the questioning at issue occurred during the guilt-or-innocence phase and was not aimed at ascertaining whether community supervision was warranted. Moreover, much of the questioning was not aimed at clarifying earlier testimony, and the district court stated in front of the jury, among other things, that the version of events described by one of the defendants was "just not possible" and "started improperly to impeach" one of the defendants "by inquiring into prior arrests." *Id.* at 1141 n.1. Accordingly, the trial court's questioning in *Lanham* fell squarely within the first potential danger stemming from a trial court asking questions beyond the permissible scope and "convey[ing] its opinion of the case to the jury and ultimately influenc[ing] the jury's decision." *See Williams v. State*, 89 S.W.3d 325, 328 (Tex. App.—Texarkana 2002, pet. ref'd).

17

_____

David Puryear, Justice

Before Chief Justice Rose, Justices Puryear and Goodwin

Affirmed

Filed:  July 22, 2016

Do Not Publish

18